CHARLES B. HATCH v. PHILIP BARRETT, *et al.*

INDORSEMENT, *Not in a Commercial Sense.*  A writing upon the back of a promissory note, transferred before maturity, in these words: "STATE OF ARKANSAS, COUNTY OF WASHINGTON, ss.: I, James C. Rogers, do hereby assign the within note to Charles B. Hatch, of Osage county, Kansas. Said assignment is made without recourse on me, either in law or equity.—J. C. ROGERS. Signed in the presence of H. F. Raymond, clerk county court, Washington county, Arkansas," is not an indorsement in a commercial sense, and will not cut off the defenses of the maker.

*Error from Osage District Court.*

ACTION brought December 16, 1881, by *Philip Barrett* and *Lucretia Barrett* against *James Hogden, J. C. Rogers* and *James Rogers, Charles B. Hatch,* and *W. E. McCrary,* to have a mortgage on certain real estate in Osage county declared void and canceled, for the reason that the same had been procured by duress and gross abuse of the criminal process of the state.  James Hogden, one of the defendants, filed his answer disclaiming any interest in the mortgage, or the pretended debt secured thereby, and the action as to him was dismissed. The other defendants filed their answer, containing, first, a general denial; and second, by way of defense and cross-petition, alleging that Charles B. Hatch was the owner and holder of the mortgage and the note secured thereby by assignment in writing thereon, in good faith, for value and without any notice whatever of any defense on the part of the makers thereof; that default had been made in the payment of the taxes, and asked for judgment on the note and foreclosure of the mortgage.  To this answer the plaintiffs filed their separate replies.  Trial at the October Term, 1883, before the court, without a jury.  The court made and filed in writing the following findings of fact:

"1. The plaintiffs are now, and for more than fifteen years last past continuously have been, husband and wife; and during all the time aforesaid, plaintiff Philip Barrett was the owner of one hundred and twenty acres of farming land situated in

Osage county, described as follows: All of the northwest quarter of section two, in township eighteen, of range sixteen, east of sixth principal meridian, except the forty acres out of the southeast corner of said quarter-section belonging to George Hill; and during all the time aforesaid, the same was occupied as a residence and homestead by said plaintiffs and their children; and at the time of the execution of the mortgage hereinafter mentioned, said land was so occupied and claimed as a residence and homestead by said plaintiffs and their family, consisting of eight children.

"2. Prior to the 3d day of January, 1881, the plaintiff Philip Barrett and the defendant J. C. Rogers had been interested in a lot of cattle, as partners, held and fed by said Philip Barrett at the farm aforesaid; and on said 3d day of January, 1881, it was claimed by said J. C. Rogers that said Philip Barrett owed him the sum of five hundred and fifty dollars, growing out of the sale of his interest in said cattle by said Barrett, while it was claimed by said Barrett that he only owed said Rogers the sum of three hundred dollars.

"3. On said 3d day of January, 1881, said J. C. Rogers employed one Alexander Blake, an attorney at law, as his attorney to obtain a settlement of his said claim, and as such attorney said Blake drew the complaint set out in plaintiffs' petition; and thereupon the said J. C. Rogers subscribed and swore to said complaint before and filed the same with R. H. Winne, a justice of the peace, duly qualified and acting as such in Osage county, and caused said justice of the peace to issue a warrant thereon in due form of law, directed to the sheriff of Osage county, commanding him to arrest said Philip Barrett for the alleged crime charged in said complaint, which warrant was thereupon delivered by said justice of the peace to said Blake as such attorney. Thereupon said J. C. Rogers went to one J. T. Underwood, one of the deputy sheriffs of Osage county, Kansas, and employed his services for that day, and agreed to pay him therefor the sum of ten dollars. Thereupon, and after dark of said day, said J. C. Rogers, his attorney, Alexander Blake, said deputy sheriff, and one Henry Hughes, went to the residence and home of plaintiffs aforesaid, and there in the presence of the wife and children of said plaintiff Philip Barrett, said Alexander Blake, as such attorney, informed said Philip Barrett that they had come for a settlement of the claim of the said Rogers. They had a warrant for his arrest for the embezzlement of the amount so claimed by said Rogers, which warrant was in the possession

of said Blake, who thereupon further informed said Philip Barrett at that time, that unless he executed a note and mortgage for said amount and also for the additional amount and sum of twenty dollars, attorney-fees for said Blake, ten dollars for the services of sheriff Underwood, and two dollars for R. H. Winne, the justice of the peace issuing such warrant, and secured the same by the execution of a mortgage upon his said homestead, by himself and wife, he would be arrested and taken to jail for said alleged embezzlement. Said Philip Barrett and his wife refused to execute said note and mortgage, and thereupon Blake took the warrant from his pocket and handed the same to said deputy sheriff and told him to read it to plaintiffs, which the said deputy sheriff then did in the presence of the children, when said Blake, as such attorney, told said sheriff not to lay hands just yet on said Philip Barrett until they, the plaintiffs, had a little more time to execute said note and mortgage, and gave the plaintiffs just ten minutes so to do, at the same time threatening them that unless said note and mortgage were signed within ten minutes, said Philip Barrett should be arrested on said warrant by said sheriff and taken to jail. The plaintiffs were alarmed and frightened by the threats of said Blake and the conduct of said parties, and the wife was in tears, and the children of the said plaintiff, alarmed and frightened, were in tears, and believing that said threats would be carried into execution and their father taken from home and to jail, besought their mother, who had refused to incumber her and her children's homestead with such mortgage, to execute the same and save their father from going to jail. Thereupon, induced solely by the threats aforesaid, and believing that they would be carried out, and plaintiff Philip Barrett would be taken from his home and family and put in prison, and believing that unless said note and mortgage were signed said threats would be carried out and said Philip Barrett arrested as commanded by the warrant, these plaintiffs at last yielded and executed the note for $582, and the mortgage described in the pleadings in this action. As soon as said note and mortgage were executed, the said parties, to. wit, Rogers, Blake, Underwood, and Hughes, left the home of the plaintiffs. Said warrant was never returned, and no record was ever made in the docket of said justice of the peace of said criminal prosecution. Said Philip Barrett never was arrested upon said criminal charge, and said criminal prosecution was thereupon dropped and no further proceedings have been ever had therein.

15—34 KAS.

"4. The sole and only object and purpose on the part of J. C. Rogers and his attorney, Alexander Blake, in filing said complaint and obtaining said warrant, was to make use of the criminal process of the court to obtain a settlement of the alleged claim of Rogers against Philip Barrett, and by reason thereof to force Philip Barrett to execute said note, and he and his wife to execute the said mortgage.

"5. Afterward, and on the 23d day of July, 1881, defendant J. C. Rogers, by an assignment in writing, placed on the back of said note, and in words and figures as follows, to wit:

"'STATE OF ARKANSAS, COUNTY OF WASHINGTON, ss.: I, James C. Rogers, do hereby assign the within note to Charles B. Hatch, of Osage county, Kansas. Said assignment is made without recourse on me, either in law or equity.— J. C. ROGERS. Signed in the presence of H. F. RAYMOND, clerk county court, Washington county, Arkansas,'

assigned and transferred said note to the defendant, Charles B. Hatch, in consideration of the sum of three hundred dollars thereupon paid by Hatch to Rogers; and at the time of said assignment Hatch had no notice or knowledge of the facts herein found, attending the execution of the note and mortgage, except such notice as would be implied by law by reason of his taking the note by assignment as aforesaid; and had no notice of any defense, or claim of defense, on the part of the maker of said note and mortgage, except only such notice as would be implied by law from his taking the same by assignment.

"6. The taxes on said land for the year 1881 were not paid by the plaintiffs, or either of them, when the same became due; and in default of such payment said land was sold at the tax sale of September, 1882, and purchased by defendant, Charles B. Hatch, and afterward, and on default of plaintiffs in the payment of the tax thereon for the year 1882, also paid the tax on said land for 1882, and had the same indorsed on the tax-sale certificate received by him at the tax sale, 1882. And afterward, on the 3d day of October, 1883, plaintiff Philip Barrett redeemed said land from tax sale, and paid all the taxes due on said land and unpaid thereon, including the charges and penalties prescribed by law.

"7. No part of said promissory note has ever been paid."

Thereon the court made the following conclusions of law:

"The note and mortgage are void; the same were obtained from said plaintiffs by duress and by an abuse of the criminal process of the courts of this state; the plaintiffs are entitled to judgment against said defendants, adjudging and decreeing

that said note and mortgage are void. The same should be surrendered to be canceled within ten days from the date of the judgment in this case.

"Unless the same are so surrendered and canceled, said decree shall stand as a full and complete discharge and cancellation thereof. Said defendants and each of them, and any and all claiming and to claim by, through or under them, ought to be forever debarred, foreclosed and enjoined from asserting any right, title or interest in or to said note or mortgage, or in or to said real estate or any part thereof, under and by virtue of said note and mortgage or either of them, and the plaintiffs ought to recover their costs in this suit, to be taxed at $——."

Charles B. Hatch filed his motion for a new trial, for the following reasons:

"1. The findings of fact and the decisions of the court are each and every one of them, and each and every part of each one of them, not sustained by sufficient evidence, and are contrary to law.

"2. Error of law occurring at the trial, and excepted to by the defendant at the time.

"3. The judgment and decision rendered by the court are not sustained by and are contrary to the evidence.

"4. The decision and judgment of the court are not sustained by sufficient evidence, and are contrary to law."

The court overruled the motion, and entered judgment that the note and mortgage described in the pleadings are void, and adjudged that the same should be surrendered for cancellation within ten days from the rendition of the judgment; and that in case the same were not so surrendered and canceled, the decree of the court should stand as a full and complete discharge and cancellation thereof. Costs were also assessed against the defendants J. C. Rogers, Charles B. Hatch, and W. E. McCrary. The defendant *Charles B. Hatch* excepted to the rulings, orders and judgment of the court, and brings the case here.

*Ellis Lewis*, for plaintiff in error.

*W. A. Madaris*, and *Scott & Lynn*, for defendants in error.

The opinion of the court was delivered by

HORTON, C. J.: Action upon a note and mortgage. The findings of the trial court are not contested before us, and we must

therefore accept them in all respects as true. The immediate circumstances attending the execution of the note and mortgage were as follows: Prior to January 3, 1881, Philip Barrett and J. C. Rogers had been interested, as partners, in a lot of cattle; Rogers claimed that Barrett owed him a greater sum on the sale of the cattle than Barrett admitted. On said January 3d, Rogers employed Alexander Blake, an attorney at law, to obtain a settlement of the partnership matters with Barrett. Blake drew up a complaint, charging Barrett with the crime of embezzling $550 belonging to Rogers, and Rogers subscribed, swore to and filed the same before a justice of the peace of Osage county, in this state, who thereupon issued a warrant for Barrett's arrest for embezzlement, and delivered the same to Blake. Rogers then employed a deputy sheriff of Osage county, named Underwood, for the day, and agreed to pay him $10. Upon the same day, after dark, Rogers, Blake, Underwood and one Hughes went to Barrett's house, and, in the presence of his wife and eight children, Blake, the attorney, told him:

"They had come for a settlement of Rogers's claim in the cattle; that they had a warrant for his arrest for embezzling $550, which was in his (Blake's) possession; that unless he executed a note and mortgage, to be signed by himself and wife, upon their homestead, for $550, and also for $20 attorney-fees for Blake, $10 for the services of Underwood as deputy sheriff, and $2 for the justice of the peace, he would be arrested and taken to jail for embezzlement."

Barrett and wife refused to do this; Blake then took the warrant from his pocket and handed it to Underwood and told him "to read it," which he did in the presence of all the parties, including the children. Blake then told the deputy sheriff "not to lay his hands on Barrett until he and his wife took a little more time to execute the note and mortgage"— giving them just ten minutes to do so; and Blake then threatened them "that unless they did so in the ten minutes, Barrett would be arrested upon the warrant and taken to jail." Barrett and his wife were alarmed and frightened by the threats and conduct of the parties, the wife being in tears; the children

were also alarmed and frightened, and in tears, and believing from the threats that their father would be taken from his home to jail, they besought their mother, who had refused to sign the mortgage, to execute the same and save their father from going to jail. Induced solely by the threats of Blake and the parties, and believing that they would be carried out, and that Barrett would be arrested under the warrant, taken from his home and family and put in jail, the latter signed the note, and he and his wife then signed the mortgage. Blake, Rogers, Underwood and Hughes immediately left.

From other findings, it also appears that the warrant issued by the justice of the peace for the arrest of Barrett was never returned; that no record was ever made in the docket of the justice showing the same or any criminal prosecution against Barrett; that Barrett was never arrested upon the charge, and that no further criminal proceedings have ever been had; that the sole and only object of Blake and Rogers in filing the complaint and obtaining the warrant, was to make use of the criminal process of the state to compel the execution of the note and mortgage in suit.

The note in controversy is in these words:

"$582.—Thirty months after date, for value received, I promise to pay to the order of J. C. Rogers the sum of five hundred and eighty-two dollars, with interest from date until paid, at the rate of ten per cent. per annum; if not paid annually, then to become as principal and draw the same rate of interest.

"This 3d day of January, 1881.      PHILIP BARRETT."

Between the parties to the original transaction, of course, the payment of the note could not be enforced in the courts. It is claimed, however, by Charles B. Hatch that he is entitled to hold the note and mortgage free from any defense which the makers could set up against the payee, upon the ground that he purchased the note for a valuable consideration before its maturity, in the usual course of business, without the knowledge of any equities or defense against it. He asserts himself to be a *bona fide* owner of the note and mortgage for

value. The following is the writing upon the back of the note, of the date of July 23, 1881:

"STATE OF ARKANSAS, COUNTY OF WASHINGTON, ss.: I, James C. Rogers, do hereby assign the within note to Charles B. Hatch, of Osage county, Kansas. Said assignment is made without recourse on me, either in law or equity.
                                            "J. C. ROGERS.
"Signed in the presence of H. F. RAYMOND, Clerk Co. Court, Washington county, Arkansas."

The question is, whether this writing can be considered in a commercial sense an indorsement. If the note was not "indorsed" to Hatch, it was not taken by him in the usual course of business by the mode of transfer in which negotiable paper is usually transferred.

"A negotiable promissory note, if payable to 'order,' can be assigned free from all equities only by indorsement, for there is no statute in this state that authorizes a negotiable promissory note payable to 'order' to be transferred free from all or any equitable defenses or claims, except by indorsement." (Comp. Laws of 1879, ch. 14, § 1; *McCrum v. Corby*, 11 Kas. 464.)

The alleged indorsement is clearly not in the usual or common form, but substantially different therefrom. The words of the indorsement, taken together, must be treated as only an assignment of the note. An assignee stands in the place of the assignor, and takes simply an assignor's rights; but the assignment of a note will not cut off the defenses of the maker. (*Trust Company v. Bank*, 101 U. S. 68; *Bank v. Walker*, 2 McCrary, 565.) We think it will be conceded that if there were only written upon the back of the note the following words: "I, James C. Rogers, do hereby assign the within note to Charles B. Hatch, of Osage county, Kansas," that such writing would not be considered an indorsement in a commercial sense. We do not think the additional words written upon the back, to wit: "Said assignment is made without recourse on me, either in law or equity," alter or change the legal rights of the parties under the written assignment, and all of the writing must be treated as merely an assign-

ment of the note. ( 1 Daniel on Neg. Inst., §§ 666, 667, 688, 701; *Martin v. McMasters*, 14 La. 420; *Hailey v. Falconer*, 32 Ala. 536; *Vincent v. Horlock*, 1 Camp. 442.)

Of course we understand that an indorsement qualified by the words "without recourse" is not out of due course of trade, and does not throw any suspicion upon the character of the paper. A note continues negotiable, notwithstanding the words "without recourse;" but in this case the indorsement goes further than the mere words "without recourse," and therefore, as before stated, we cannot consider the writing by which the note was transferred as an indorsement in a commercial sense. If parties accept paper with the indorsement "without recourse," with the expectation that the paper is negotiable, the indorsement ought to be made in strict compliance with the technical rules of commercial law, in this way : "Without recourse. John Doe;" or, "Pay to Richard Roe, or order. Without recourse. John Doe;" or in some other like form. This disposes of the case, as, upon the foregoing conclusion, the judgment of the district court must be affirmed.

*Indorsement, not in a commercial sense.*

The writer of this, however, feels impelled to express his individual views upon another question, discussed at length in the briefs — that is, whether the duress in the inception of the note utterly avoids it, even if Hatch were a *bona fide* holder for value. The decisions generally support the doctrine that the holder of negotiable paper before maturity and without notice takes it clear of equities between the original parties, even when obtained under duress. This doctrine is declared to be necessary in order to give security to negotiable paper. (*Belas v. Neddo*, 1 McCrary, 206; *Hagan v. Moore*, 48 Ga. 156; *Clark v. Pease*, 11 N. H. 414.) It is doubtful whether the reasons given in the decisions are convincing or logical. There are many things to be said in favor of holding a note void, where it is signed by a party under severe threats and danger of personal violence. In such a case the party is not a free agent, and is in no default. A contract entered into under duress lacks the first essence of validity —

that is, it wants the essential ingredient of the free assent of the contracting party. And a note, whether secured by mortgage, or not, ought to form no exception to the rule, even in the hands of a *bona fide* holder for value. No rights ought to be acquired by such an act of violence or force.

Mr. Daniel, in his excellent work on Negotiable Instruments, says:

"Indeed, we can discern no principle which would compel any person, whether a party to a negotiable or other kind of instrument, to pay it, when under violent duress—that is, under the compulsion of force, with the only alternative of submitting to great bodily injury or indignity. Consent is of the essence of every contract, and if it is not given, the party should not be bound, if he had no alternative but to seem to give it or suffer grievous wrong. *He creates no trust;* he commits *no negligence,* whereby the confidence of another can be betrayed. He is in no default, having a right of self-defense in preferring his own life and safety to the chances of pecuniary injury to others; and his extorted act is nothing more or less than the act of a wrongdoer who uses his person as the instrument of forging his name." (Vol. 1, § 858, pp. 651–652.)

Prof. Parsons says, in vol. 1, Notes and Bills, p. 276:

"A distinction may perhaps be taken between notes obtained by fraud and those obtained by force or duress. In the former case, we should say that the defrauded party would generally be liable to a *bona fide* holder. But a note or bill obtained by duress might not be available in any hands against the party so compelled; and if the note were a good note, and a subsequent party indorsed it by duress, he would not be bound to anyone."

In Roscoe's Digest of Bills and Notes, note 20, p. 117, it is said, in commenting on *Duncan v. Scott,* 1 Campb. 100:

"It may be doubted whether the defendant in this case was liable even to a *bona fide* indorsee for value. The bill being drawn under the duress, no contract arose, and it resembles the case of a bill drawn by a *feme covert,* who is under a disability to contract."

In *Richardson v. Duncan,* 3 N. H. 508, it was said:

"That when there is an arrest for improper purposes, with-

out a just cause; or where there is an arrest for a just cause, but without lawful authority; or where there is an arrest for a just cause, and under lawful authority, for unlawful purposes, it may be construed a duress."

It was held in *Alexander v. Pierce*, 10 N. H. 494, that where a promissory note is executed under menace of imprisonment, and it appeared that the menace was of an unlawful imprisonment, and that the party was put in fear of imprisonment and thereby induced to execute the note, the note was void.

In *Meadows v. Smith*, 7 Ired. Eq. N. C. 7, a note executed by a poor, ignorant old man for the purpose of being released from an arrest made at a late hour of night, on the groundless charge of conspiracy, was held void.

In *Collins v. Westbury*, 2 Bay (S. C.) 211, it was said by the court:

"So cautiously does the law watch over all contracts, that it will not permit any to be binding but such as are made by persons perfectly free, and at full liberty to make or *refuse such contracts*, and that not only with respect *to their persons*, but in regard to their *goods and chattels also*. Contracts to be binding must not be made under any restraint or fear of their persons, otherwise they are void, as in the case of *Evans v. Huey & Franklin*, vol. 1, p. 13, (Riley's edit.,) where a note was deemed void, both as to principal and his security, where a party of armed men, in quest of horse thieves, called at a man's house in the night, and Evans, one of the party, demanded of the man of the house a settlement or satisfaction for an injury he had sustained some time before, in a quarrel; and the defendant Huey, in order to compromise the matter, gave his note for twenty-eight pounds sterling, and the next morning got Franklin, his neighbor, to be his security. In that case, it *was deemed duress;* because an armed party going to his house in the night-time, and one of them demanding a settlement for a former injury, was calculated to alarm a man's fears, although no threats were made use of. This to be sure was only a *nisi prius* case. But it has been a leading case on the subject, and admitted as the law of duress, ever since."

Coke said, in 2 Inst. 483:

"A man shall avoid his deed for *manuas* of imprisonment,

albeit he were never imprisoned; for a man shall avoid his own act for manuas in four cases, viz.: (1) For fear of loss of life; (2) of loss of member; (3) of mayhem; and (4) of imprisonment."

In *Forshay v. Ferguson*, 5 Hill, 158, in referring to the rule laid down by Coke, Bronson, J., said:

"If a deed might be avoided nearly three centuries ago on the ground that it was procured by threats and the fear of illegal imprisonment, there can be no room for doubt upon the question at the present day. As civilization has advanced, the law has tended much more strongly than it formerly did to overthrow everything which is built upon violence. . . . I do not intend to say that a man can avoid his bond on the ground that it was procured by an illegal distress of goods, but I entertain no doubt that a contract procured by threats and fear of battery or destruction of property, may be avoided on the ground of duress. There is nothing but the form of a contract, in such a case, without the substance. It wants the voluntary assent of the party to be bound by it."

In *Hatter v. Greenlee*, 1 Port. 222, the court decided that—

"There is duress of imprisonment sufficient to invalidate acts done thereby, where there is restraint of liberty without warrant of law; or where the warrant, though legal, has been obtained upon a false charge without probable cause; or where an arrest, legal in inception, has been followed by maltreatment of the prisoner." (26 Am. Dec. 378, and the notes cited.)

In the case of *United States v. Huckabee*, 83 U. S. 414, Mr. Justice Clifford, in delivering the opinion of the court, said, among other things:

"Duress, it must be admitted, is a good defense to a deed, or any *other written obligation*, if it be proved that the instrument was procured by such means; nor is it necessary to show, in order to establish such a defense, that actual violence was used, because consent is the very essence of a contract, and if there be compulsion, there is no binding consent, and it is well settled that moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, as well as that produced by imprisonment, is sufficient in legal contemplation to destroy free agency, without which there can be no contract, because in that state of the case there is no consent. Unlawful duress is a good defense to a contract, if it includes such degree

of constraint or danger, either actually inflicted or threatened and impending, as is sufficient in severity or apprehension to overcome the mind and will of a person of ordinary firmness. . . . Positive menace of battery to the person, or of trespass to lands, or of destruction of goods, may undoubtedly be, in many cases, sufficient to overcome the mind and will of a person entirely competent, in all other respects, to contract, and it is clear that a contract made under such circumstances is as utterly without the voluntary consent of the party menaced, as if he were induced to sign it by actual violence; nor is the reason assigned for the more stringent rule, that he should rely upon the law for redress, satisfactory, as the law may not afford him anything like a sufficient and adequate compensation for the injury."

In *Anderson v. Anderson*, 9 Kas. 112, Mr. Chief Justice KINGMAN, speaking for this court, said:

"The only other error urged in this court is as to the instructions. But little of the evidence is in the record, and there is nothing in the scraps preserved that tends in any way to show that the plaintiff in error was not a *bona fide* purchaser for a valuable consideration. So far as we can perceive, the jury decided the case on the ground that defendant in error signed the deed under duress. If she did so, she never gave that consent to the alienation of the homestead that the constitution requires, and the court submitted this question fairly to the jury under proper instructions. As we understand the law on this point the good faith of the purchaser cuts no figure, and the court correctly refused the first instruction asked by plaintiff in error." (*Brown v. Pierce*, 7 Wall. 214; Chitty on Contracts, 217; 2 Greenl. Ev. 283; *Baker v. Morten*, 12 Wall. 158; *Watkins v. Baird*, 6 Mass. 506 — 4 Am. Dec. 170–173; *Whitefield v. Longfellow*, 13 Me. 146; *Gulleaume v. Rowe*, 94 N. Y. 268; *Helm v. Helm*, 11 Kas. 19.)

The authorities holding that duress is not available as a defense where the note is purchased before maturity for value and without notice, are to the effect that there is no distinction in fact between a note the signature to which is obtained by fraud, and one where the signature is obtained by duress. This is hardly sound doctrine. If a person signs a note "under the compulsion of force, with the only alternative of submitting to great bodily injury or indignity," he is certainly not a

free agent, and is nowise in default. Actual fraud is any cunning, deception or artifice used to circumvent, cheat or deceive another; and fraud, as usually defined in courts of equity, includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence justly reposed, and are injurious to another; or by which an undue and unconscientious advantage is taken of another. (1 Story's Eq. Jur., §187.)

Now a person whose signature is obtained to a note by fraud only, is in a different condition ordinarily from one who signs an instrument under threats and dangers of personal violence, or great indignity; and while fraud in obtaining the signature of a person would be fatal in a case between the original parties, yet to some extent, both parties being in fault, neither should be allowed to take advantage of his own wrong as against an innocent party; hence the doctrine that mere fraud between the original parties will be no defense or bar to the title of a *bona fide* holder of the note for value. But a person who signs a note or any other obligation under threats and danger of great bodily injury or indignity, cannot be said to be at fault or guilty of wrong.

The conduct of James C. Rogers in obtaining the note and mortgage is exceedingly reprehensible, and deserving of the severest condemnation. If possible, all loss occasioned the plaintiff from his purchase of the note and mortgage should fall upon Rogers, as he evidently is the wrongdoer and ought to be made responsible for the unlawful acts committed by him.

The judgment of the district court will be affirmed.

All the Justices concurring.