No. 24,075.

JOHN W. GRAVES, *Appellee,* v. HARRY O'BRIEN et al., *Appellants.*

SYLLABUS BY THE COURT.

1. CANCELLATION OF WRITTEN INSTRUMENTS—*Conveyances Obtained by Duress and Threats—Evidence Sustains Charge.* The plaintiff brought an action to set aside a conveyance, to cancel certain notes and a mortgage, also another agreement, upon the ground that he had been put in fear and compelled to execute them under duress excited by threats of prosecution and imprisonment for an alleged offense, when in fact the act charged against him was not an offense. The relief asked was granted and it is held that the evidence is sufficient to show the fraud of the defendants participating in the transaction, that duress was established and that the plaintiff was entitled to the relief given.

2. SAME—*Parties Not in Pari Delicto.* Held, further, that plaintiff was not barred from the relief asked on the ground that the parties were equally at fault in the illegal agreements, nor because he yielded to the demands of the defendants.

3. SAME—*Duress Established.* A case of duress is made out where one party is compelled to make agreements through fear of prosecution and imprisonment excited by the threats of other parties to the agreements.

4. SAME—*Offer of Restoration by Plaintiff Unnecessary.* Under the circumstances shown to have existed the plaintiff could not be denied relief on the ground that he had not offered to restore that which he had received in the fraudulent transaction, and in fact nothing of value had been so received.

5. SAME—*Wife of Plaintiff Not a Necessary Party.* The wife of the plaintiff was not a necessary party in the action brought.

6. SAME. *Bank Responsible for Fraud of Its Cashier.* The notes and a mortgage were procured to be given through the active fraud of its cashier. As he was acting for the bank, and as the bank received and appropriated the fruits of the fraudulent transaction, it is responsible for the fraud.

7. SAME—*Bank Not a Holder of Note and Mortgage in Due Course.* Under the evidence the bank to which the notes and mortgage were indorsed and transferred by the payee bank is not a holder in due course. ·

Appeal from Clay district court; FRED R. SMITH, judge. Opinion filed May 6, 1922. Affirmed.

*W. T. Roche, George L. Davis,* both of Clay Center, and *A. E. Crane,* of Topeka, for the appellants.

*C. Vincent Jones,* and *R. C. Miller,* both of Clay Center, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.:    This was an action to compel the reconveyance of certain real estate, the cancellation and surrender of promissory notes, and of a mortgage given as security for the notes, and to cancel an agreement, all executed by the plaintiff through the alleged fraud and duress of the defendants. Plaintiff also asked that defendants be enjoined from transferring the property pending the action, and that, in case the relief asked could not be granted, he recover the actual damages sustained through the fraud and duress of the defendants. Judgment was given for plaintiff, and defendants appeal.

Upon the evidence about which there is practically no dispute the court made elaborate findings of fact. A summary of the special findings and undisputed evidence is that John W. Graves is a farmer about seventy-three years of age, who had reared a family of seven children, five of whom are still living, and one of whom is his daughter, Laura A. Reid, who is married to Frank M. Reid. Plaintiff's first wife and the mother of his children died in 1908. He resides on a farm near Clifton in Washington county, and had transacted all of his banking business with the Citizens State Bank of Clifton. Harry O'Brien is the cashier of that bank, and plaintiff had great confidence in him and trusted him to look after not only his banking business but also to advise him in his personal affairs, and he had also entrusted him with the drawing up of practically all of his legal papers. On February 27, just before going on a journey to Arkansas to be married, he had prepared a deed purporting to convey the legal title of 120 acres of land to his daughter, Laura, in which he reserved the life estate · in himself, but he did not sign or acknowledge the instrument at that time. On March 2, 1918, he was married to Allie Johnson, in Arkansas, and returned with her to his home near Clifton on March

4, 1918. She lived with him only about seven weeks and then returned to her former home in Arkansas and since that time she and plaintiff have not lived together as husband and wife. Within a week after plaintiff returned from Arkansas with his wife, he took the deed formerly prepared conveying the land to his daughter and signed and acknowledged the instrument before O'Brien, who was a notary public, and O'Brien took charge of the instrument and filed it for record. While the acknowledgment was dated March 2, 1918, it was not in fact made on that day, but was made after the return of plaintiff from Arkansas, and sometime between the 4th and 11th of March, 1918. The plaintiff did not direct the antedating of the acknowledgment, but it was done by O'Brien without the knowledge of plaintiff. This juggling of dates was subsequently used to terrorize the plaintiff on the theory that the change of dates constituted a crime, and that plaintiff could only avoid imprisonment in the penitentiary by the execution of the instruments involved in this action. Plaintiff had a disagreement with Frank M. Reid as to some alfalfa and silage grown on one of his farms. It was shown and found that on February 7, 1919, Frank M. Reid was indebted to the Citizens State Bank in the sum of $3,130.05, and also before that time the bank commissioner had ordered the bank to reduce this indebtedness. At that time Reid was unable to pay the indebtedness and was practically insolvent. On February 7, 1919, O'Brien telephoned to Elmer Graves, a son of plaintiff, to bring his father to the bank to attend to a business matter, and in response to the call plaintiff and his son went to the bank, arriving there about 2 p. m. O'Brien invited them into a private room of the bank and then informed them that Frank M. Reid had called at the bank that morning and had said to O'Brien that he had learned of the wrongful dating of the acknowledgment on the deed, that the dating back was a penitentiary offense, and that he intended to institute a prosecution against plaintiff and O'Brien for the crime. He had further stated that he had already employed two of the best lawyers in the state to conduct the prosecution and had arranged with plaintiff's wife in Arkansas that she would send a lawyer to coöperate with the Kansas lawyers in sending O'Brien and the plaintiff to the penitentiary unless the plaintiff would settle on the terms proposed by Reid. O'Brien professed to plaintiff to be greatly excited about the danger he and plaintiff were in on account of the purposes and threats of Reid and because of these threats and the apparent excitement of

O'Brien plaintiff, too, became agitated and fearful that he might be sent to the penitentiary. By reason of the confidence he had in the honor and integrity of O'Brien he strongly relied on his advice and judgment and when he told the plaintiff that an offense had been committed, which made them liable to imprisonment he believed him, although plaintiff did not know until that time that the acknowledgment had been dated back nor did he know that such an act was a violation of· law, and a penitentiary offense. During the interview an attendant knocked at the door of the room and upon being admitted informed O'Brien that Reid was in the bank and wished to see him. O'Brien told the attendant to show Reid in. When Reid ·entered he assumed an angry attitude, slammed his hat and coat on the floor of the room, advanced in front of plaintiff, shook his fists in his face and said in substance, that he was there for blood and a fight to the finish and if plaintiff did not settle with him on his terms he would send plaintiff and O'Brien to the penitentiary. He said that he had lawyers employed and they would be there in a few hours if plaintiff did not make the proposed settlement. Because of the statements and threats plaintiff was put in great fear ·and was led to believe that he would be put in prison if he did not settle. Reid then left the room, whereupon O'Brien advised plaintiff that Reid be brought back and asked the·terms upon which a settlement could be made. O'Brien then left the room and soon returned saying he had found Reid in a long distance booth of the telephone office, talking to someone in Atchison, and while he could not hear the conversation, he thought that he ·was talking with Atchison lawyers, and he then insisted that plaintiff had better settle with Reid. Soon Reid returned to the conference and O'Brien then asked him to state his terms of settlement. Reid replied that if plaintiff would. accept his terms there would be no prosecution and the terms stated were that plaintiff should take up Reid's indebtedness at the bank of $3,130.05, make a deed conveying to Laura A. Reid the farm of 120 acres, deliver certain named quantities of alfalfa and silage, give him a lease for a year of a tract of alfalfa land on terms that were named, and plaintiff, laboring under fear and duress and under the advice of O'Brien, agreed to accept Reid's terms. It was then too late to complete the papers as the conference had lasted from 2 p. m. until dark and it was arranged that plaintiff should return the next morning to execute them. When he returned a deed to the farm that had been prepared was signed and acknowledged

before O'Brien, and was left with him for delivery, two notes were executed by plaintiff to the bank, one for $1,630.05 and the other for $1,500, both payable one year after date with interest at the rate of 6 per cent payable semiannually. A mortgage upon a farm of plaintiff was given to secure the payment of the notes, but by reason of his excitement and duress, plaintiff did not know that he had signed the mortgage until September 12, 1919. Another paper was executed by him and the Reids, called "final settlement agreement," which recited that plaintiff was desirous of making full and final settlement with Laura A. Reid as to any estate that he might leave, and it was stipulated that in consideration of $3,130.05 paid by plaintiff, the delivery of two tons of alfalfa and twelve loads of silage, and a lease on alfalfa land, Laura A. Reid released and relinquished forever all claims she might have in plaintiff's estate, and that Frank M. Reid would drop all differences he had with plaintiff. All these papers were acknowledged before O'Brien. At this time plaintiff did not owe either of the Reids anything and he did not receive any consideration from either of them for the obligations and instruments which he was fraudulently induced to sign. It was found that all were signed when he was unable to exercise his free will, that he was in a state of terror by reason of the threats that had been made and by being led to believe that he could only escape imprisonment in the penitentiary by settling upon the terms proposed. After the bank got the notes and mortgage and on September 15, 1919, O'Brien indorsed and delivered them to the Union State Bank of Clay Center, which gave the Citizens State Bank a credit upon its books for $3,130.05. The Citizens State Bank never checked against the credit thus given in the Union State Bank, and the latter has never paid anything out of that fund, but the amount still stands there to the credit of the Citizens State Bank. Before indorsing and delivering the notes to the Union State Bank, O'Brien made an indorsement of the payment of six months' interest on the notes and this was done without any payment having been made and without the direction or knowledge of the plaintiff. He did not know that the interest payment had been made or the amount charged to his account until after the commencement of the action. The action was begun on September 24, 1919, and summons was served on that day on the Union State Bank and other defendants, notifying them of the fraud and duress charged and of the relief demanded. Some other findings were made by the court as to the rental value of the land transferred,

the life expectancy of plaintiff, and the value of the life estate of plaintiff in the land conveyed to his daughter.  Plaintiff did not consult with counsel as to his rights or as to whether the antedating of the acknowledgment constituted a public offense and during all of the intervening time he had labored under the belief that he and O'Brien had committed a public offense and was under fear and duress by reason of the statements and threats made to him by Reid and O'Brien.  As the Reids were attempting to sell the land conveyed, an order of injunction was made restraining them from disposing of it.  It was further found that the Union State Bank was not a holder in due course of the notes transferred to it, and that they are still in the possession of that bank.

The court concluded and adjudged that within ten days the Reids should reconvey the land in question to plaintiff, that the Union State Bank should surrender into court the notes together with the mortgage, with a release of the mortgage, that the final settlement agreement should be surrendered for cancellation, and that by reason of the fraud and duress the notes, mortgage and agreements should be cancelled.  It was also adjudged that plaintiff recover from the Reids, O'Brien and the Citizens State Bank, a judgment for $1,600, the value of the use of the land since the deed was executed, and for the further sum of $93.90 for the interest payments which had been charged to plaintiff's account in the bank.

One contention of the defendants is that the evidence does not warrant a recovery by the plaintiff.  The recital of the facts, only the substance of which has been given, reveals a cunningly devised plan to defraud the unsophisticated plaintiff by the Reids, the Citizens State Bank and its cashier, O'Brien.  They were actuated by different motives, and were seeking to accomplish different results, but used the same culpable means of securing them.  The Reids sought to obtain the payment of a debt of Frank M. Reid to the bank, and the full title, including a life estate, in a valuable tract of land, as well as some other advantages of less value.  The Citizens State Bank and O'Brien connived to secure the payment of an indebtedness to the bank of Frank M. Reid, who was insolvent.  The loan made to him by the bank was in excess of the prescribed limitation, and the bank commissioner had brought pressure upon it to reduce that indebtedness, and it undertook to do so by the unconscionable means already stated.  These parties seized upon the circumstances of the antedating of the acknowledgment to frighten

the plaintiff into the belief that he had committed a crime and could only escape imprisonment in the penitentiary by yielding to their demands for the conveyance of the land to Mrs. Reid, the payment of the obligations of Mr. Reid, and giving him other property and benefits and also to relieve the bank from its embarrassment by compelling plaintiff to pay an obligation which it held against an insolvent debtor. It may be said that not many would have been so easily lured into the baited trap that was set for plaintiff, but it appears that he was ignorant of the law relating to the conveyance of real estate, the acknowledgment of instruments by an officer, and the penalty prescribed for false certificates in the acknowledgment of instruments of conveyance. Besides, he had full confidence in the intelligence, fidelity and honesty of O'Brien, who had been his trusted adviser in business matters for years. When O'Brien advised him that the law had been violated and that both were subject to imprisonment for the false statement as to dates in the acknowledgment he naturally accepted his statements as true, and believed that he was giving him honest advice. The pretended excitement and distress of O'Brien because of the imminent peril that both might be sent to the penitentiary if plaintiff did not appease Reid and comply with his demands, were well calculated to intimidate plaintiff and deprive him of his free will and that state of mind essential to the making of a valid contract. The evidence abundantly establishes the threats of Reid, the coöperation of O'Brien, the bank and Reid in the fraudulent scheme, and it is worthy of remark that no one of these parties denied the statements made by the plaintiff in his testimony or offered any testimony in explanation or exculpation of the frauds and wrongs offered in evidence by the plaintiff.

There is a contention by defendants that the untruthful statement in the acknowledgment was a public offense, that plaintiff was equally guilty with O'Brien, the bank and Reid in concealing the crime through the making of the illegal contracts, and that plaintiff's hands not being clean he has no right to set aside the illegal contracts or to ask the aid of a court of justice in vacating or enforcing any of the illegal acts. The contention is not tenable. The parties are not as defendants contend, in *pari delicto*. The statute does provide that anyone taking an acknowledgment who wilfully certifies that a conveyance was proved when no proof was made, or certifies falsely as to any material matter contained in a certificate

of acknowledgment shall upon conviction be adjudged guilty of forgery in the second degree. (Gen. Stat. 1915, § 3500.) O'Brien, who placed the false statement as to dates in the certificate, may be liable to prosecution and punishment under the statute, if the act was done wilfully, but the plaintiff had no part in making the false statement and, according to the testimony and findings, had no knowledge that a wrong date had been placed in the certificate until the time that he was terrorized and coerced into the execution of the written instruments. He was not on equal footing with the defendants, as he had not in fact committed a crime. Neither can the rule be invoked that he should be denied relief because of the compounding or concealment of crime. The agreements made were not for any profits to plaintiff, but were extorted from him by overcoming his will. That which was done by him was without his consent. The agreements, having been made without his consent, were nullities, and therefore it may be said that he had done nothing. The rule invoked by defendants can have no application to the circumstances of the case, and under the facts proven it is clearly within the power and duty of a court of equity to declare the contracts void and grant the relief asked.

There is a further contention that actual duress was not shown because the plaintiff was in possession of his faculties, was accompanied by an adult son, and was free to leave the bank at any time while the pressure upon him was exerted. The threat that he would be arrested and imprisoned and the consequent disgrace was sufficient to put him in fear and lead him to act contrary to his will and inclination. A case of duress is made out where there is a fear of prosecution or imprisonment, excited by threats. In *Thompson v. Niggley,* 53 Kan. 664, 35 Pac. 290, it was held:

"Written securities, extorted by means of threats of prosecution for criminal offenses of which the party threatened was guilty in fact, but which were in no manner connected with the demand for which compensation was sought, may be avoided by the parties executing them, not only in the hands of the original payee, but of his assignees having notice of the circumstances under which such securities were taken." (Syl.) .

In *Williamson v. Ackerman,* 77 Kan. 502, 94 Pac. 807, it was held that where a father was coerced into executing a mortgage to secure the payment of the defalcation of his son by reason of threats of prosecution of the son for embezzlement, which amounted to duress, it would avoid the mortgage. It was held that the test in determin-

ing whether there was duress was not so much the means by which the father was compelled to execute the mortgage as it was the state of mind induced by the means employed, the fear which made it impossible for him to exercise his own free will. It was further held that if the threats deprived the father of his free will the actual guilt or innocence of the son upon the criminal charge was not a material question in determining whether there was duress.

There is nothing substantial in the contention that plaintiff did not restore or offer to restore that which he had received in the transaction. He had nothing of consequence to restore. It was a one-sided transaction in which all the benefits went to the defendants. The plaintiff did receive the final settlement agreement which, as we have seen, is a void instrument. Those who prepared it evidently had some misgivings as to the adequacy of the consideration for the deeds, notes and mortgage, and compelled the plaintiff to sign this agreement, reciting as a consideration that Laura A. Reid had agreed to relinquish all her rights in the estate of the plaintiff. She had no claims against him and no mention was made of the surrender of rights of inheritance. There was no purpose to subserve in tendering back the agreement, as the plaintiff had brought it into court and had asked to have its validity determined.

Nor is there any good ground for the complaint that Allie Johnson, to whom plaintiff had been married, was not made a party. She had taken no part in the transaction, and was not concerned with the question of fraud in the litigation nor with the relief asked. She was in no sense a necessary party.

It is further argued that the Citizens State Bank should not be held responsible for the fraud perpetrated by the cashier. He acted for the bank and it did not disavow his act in either pleading or evidence, but took the fruits of the fraud and is still insisting that it is entitled to them. It was sufficiently shown that O'Brien was acting for that institution and that the bank coöperated with the Reids and O'Brien in the extortion.

It is further argued that the Union State Bank is a holder in due course. When the transfer was made a credit was given the Citizens State Bank, but no checks were ever drawn by it, and it was the manifest intention that none should be drawn. The notes and mortgage as well as the money represented by them were still in the hands of the Union State Bank when the action was begun and the

fraud in the transaction had been fully revealed. When it was shown that the notes had been fraudulently procured and that the title of the Citizens State Bank that negotiated the notes, was defective, the burden was shifted to the Union State Bank to prove that it was the holder in due course. This burden was not met by the Union State Bank. We think the court was warranted in finding from the evidence that the bank was not a holder in due course. (*Ireland v. Shore,* 91 Kan. 326, 137 Pac. 926; *Bank v. Bank,* 100 Kan. 194, 164 Pac. 137.)

Some other exceptions are mentioned by defendants, but we find nothing in them that is material or which requires special comment. The judgment rendered was within the power of the trial court, was well supported by the evidence, and its judgment is affirmed.