No. 29,509.

F. F. FRITCHEN, *Appellee,* v. E. C. MUELLER and MARY JACOBS, *Appellants.*

(297 Pac. 409.)

Opinion filed March 7, 1931.

*R. L. Hamilton, C. L. Kagey, Leon W. Lundblade* and *L. M. Kagey,* all of Beloit, for the appellants.

*A. E. Crane, B. F. Messick,* both of Topeka, and *N. C. Else,* of Osborne, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: This was an action on a promissory note. The defense was a plea of duress. After the cause was tried in full before a jury the court gave an instructed verdict for plaintiff. That ruling is the basis of this appeal.

The facts and circumstances developed by the pleadings and by the evidence favorable to defendants were to this effect:

Prior to October, 1924, the defendant, E. C. Mueller, had served for a number of years as cashier of the Home State Bank of Tipton. Thereafter he obtained employment in a bank in North Kansas City, Mo., and removed there with his wife and family. It may be inferred from the record that his conduct of the affairs of the Tipton bank had not been successful and the board of directors of that institution held the view that in some undisclosed way he was responsible for some untoward state of its affairs. On January 9, 1926, the stockholders of the Tipton bank held a meeting at which this plaintiff F. F. Fritchen and M. Lutgen and other stockholders, comprising members of the prior board of directors, were reëlected for the ensuing year. The minutes recite that it was the sense of the stockholders that—

"Those directors who may be elected bring all pressure possible to have some of this money returned even though they deem it advisable to bring action against the bonding company of the former cashier."

This was followed by the meeting of the board of directors, at which it was voted that the prior officers, including this plaintiff F. F. Fritchen, vice president, and A. Diebold, cashier, should be reëlected. The minutes of this meeting also recite:

"It was further moved, seconded and carried that F. F. Fritchen and M. Lutgen go into the matter pertaining to the fidelity bond of E. C. Mueller and if possible to obtain payment thereon for losses sustained which we believe came about through transactions made by the former cashier E. C. Mueller and such transactions do not come up fully to our approval, and the cashier to render all assistance possible in this matter."

Shortly thereafter Diebold, the cashier, accompanied by N. C. Else, a lawyer who had previously acted as attorney for the bank in particular matters and who has subsequently acted as attorney for the bank and for Fritchen, its vice president, plaintiff herein,

met defendant Mueller in Kansas City in the latter part of January, 1927. Diebold stated that Mr. Else was there to see Mueller as representative of the board of directors of the Home State Bank of Tipton. At first the court would not permit testimony to be given as to what Mr. Else himself said to Mueller, but later testimony concerning that conversation was admitted:

"Q. . . . What did Mr. Else say to you, and what did you say to him? A. He said he was down there representing the directors of the Home State Bank of Tipton.

"[COUNSEL FOR PLAINTIFF]: We move to strike that out as hearsay.

"THE COURT: Motion is sustained as to that. . . .

"Q. All right, go ahead; what else did he say? A. He said, 'The directors claim that you have some money that belongs to the bank, and that there were several items that they didn't understand what became of them.' And I said, 'I would like to have you be a little more explicit and tell me just what the claims are,' and he pulled out a yellow sheet of paper with five or six or seven figures on it, with dates, but no names. I glanced at them and I said to Mr. Else, 'What do you mean by these figures and these dates?' and he says, 'Well, this is some of the amounts that the bank claimed that you have the money for.' I told him I wasn't conscious of having taken any money from anybody in Tipton. He said, well he didn't know so much about that, but that is what they were claiming, and he was there to see what I was going to do about it. . . . And he said: 'You better come out to Osborne the next few days, because this matter is in a hurry.' He says, 'Your bond as cashier will expire within two or three weeks, and if you don't settle before that time, the bonding company will have you arrested.' . . . And then on the 10th of February, which was on Wednesday, I arrived in Osborne. . . .

"Q. I will ask you this, Did you or did you not believe that unless you signed this note that you would be indicted and disgraced? A. I certainly did.

"Q. Gene, I will ask you if to your knowledge you had violated any law for which you might have been indicted? A. No, sir. . . ."

Shortly thereafter, on February 8, 1926, Mr. Else went to the home of the defendant, Mrs. Mary Jacobs, mother-in-law of Mueller. She is a woman of some means and resides with her husband in Tipton, some miles distant from Osborne. Mr. Else introduced himself as attorney for the Tipton bank, and presented two notes for $3,000 each, which he wanted her and her husband to sign. She asked him why she should do so:

"Well, he said that he wanted me to sign those two notes, or if we don't sign them, that he wouldn't say what would happen, and then I was scared to death, and I called for my husband, and he came into the room then and then he stated to him, that he was here to get me and Mr. Jacobs to sign

those notes or if we didn't sign them Gene (Mueller) would be sent to the pen, or something like that, he said."

Mr. Jacobs, husband of defendant Mary Jacobs, testified:

"A. Well, he said if we wouldn't sign them he would have Gene arrested and sent to the penitentiary. . . .

"Q. Did he [Else] do any more or say any more after that? A. Threatened he would have him arrested and sent to the penitentiary.

"Mr. Else said he had been down in North Kansas City and seen the daughter of witness, that is defendant Mueller's wife, and that she was all excited."

Next day Mrs. Jacobs called at the Tipton bank and asked Cashier Diebold what would happen if she didn't sign the notes. Diebold called Mr. Else at Osborne over the long-distance telephone and then stated to her that if she persisted in her refusal he [Mr. Else] would start for Topeka next morning.

Mr. Else got in touch with Mueller in Kansas City, and in response thereto Mueller came to Osborne on February 10, 1926. Mr. Else met Mueller at the train and took him to his law office, where he met the plaintiff Fritchen and M. Lutgen. These two men were the committee of the bank appointed to apply pressure on Mueller, as recited in the minutes of the stockholders' and directors' meetings in January. After some talk Fritchen, Lutgen and Else and another bank officer retired to another room for consultation. Else then reappeared and told Mueller "that the directors were in a very hostile mood and he didn't know how he could hold them off." Mueller testified:

"He told me that the directors had decided on $10,000. And that I had better sign, make arrangements to sign the notes and turn over property if I knew what was good for me."

Fritchen and his confreres then reappeared and in their presence Mueller signed the note involved in this action for $3,000, and another note for a similar sum; also one for $1,000, and he also agreed to convey to the bank certain lands and assign his stock in the Tipton bank. Mr. Else took charge of the notes and he and Mueller departed for Tipton to procure Mueller's mother-in-law's signature thereto. Mr. Else stated to Mueller that he had been in Tipton a short time before and had told her that if she wanted to save Mueller from the penitentiary she would better get ready to sign the notes. When Mueller and Else arrived at the residence of defendant Jacobs, Mueller told her that Mr. Else threatened him with indictment and loss of his position and dire consequences to his

family. Mr. Else then asked her to sign, and when she still hesitated he said:

"If you don't sign these notes for Gene here, why it will be just too bad for him. I think I will go down to Topeka to-morrow with the directors. . .

"A. . . . He shoved the notes over to her to sign them. . . . Mrs. Jacobs started to crying for a while; didn't do anything, didn't sign, but she finally did."

Without recapitulating more of the record, it can readily be discerned that the trial court incurred a grave responsibility when it brushed aside all this evidence of duress and directed a verdict in favor of plaintiff.

To sustain such a ruling counsel for the appellee reiterate many times that Mr. Else was not the agent of the bank. The assertion may be true, but certainly the facts and circumstances tended to establish such agency—clearly enough, at least, to make that point of issue a question for a jury to determine. And if Mr. Else was the agent of the bank—as a jury might conclude from the evidence—the bank would be bound by what he said and did to coerce Mueller and his mother-in-law to sign the note in suit. The circumstances also tend to show that the plaintiff Fritchen complied only too effectively with the resolutions of the stockholders and the board of directors appointing him and Lutgen to apply pressure on Mueller to settle the bank's claims (whatever they were and whatever their merit). It is a fair inference that Fritchen's effort at compliance with that resolution was simply to secure the services of a strong-willed masterful lawyer who knew how to get results, and those results speak for themselves. Evidently those results materialized in these notes, one of which is now in controversy. How otherwise could Mr. Else's appearance and activity in the affairs of the bank be explained? It should be understood, of course, that in discussing these matters in this blunt fashion this court does not intend to adjudicate for itself the controverted facts of this case. What defendants testified to concerning the course and conduct of Mr. Else may not be true, and plaintiff's evidence to the contrary may be true. But in testing the propriety of directing a verdict in favor of plaintiff, defendants' evidence must be given the most generous credence with all favorable inferences which can be drawn thereto; and all the evidence which plaintiff adduced to the contrary must be ignored and put out of consideration entirely. It might be thought that this rule of procedure and practice would hardly need

to be fortified by authorities, but among the many to that effect the following recent cases may be cited: *Gould v. Stewart,* 103 Kan. 847, 176 Pac. 630; *Sentney v. Central Cattle Loan Co.,* 119 Kan. 545, 240 Pac. 856; *Cecil v. Bridges,* 125 Kan. 189, 263 Pac. 1058; *Kansas Wheat Growers' Ass'n v. Loehr,* 125 Kan. 491, 264 Pac. 735.

On the question whether Mr. Else was the agent of the bank in coercing the defendants Mueller and Jacobs, or either of them, to execute the notes, it was not of controlling importance that direct evidence may have been lacking to prove the fact of agency; it could fairly be implied from the conduct of the parties and all the relevant circumstances. (*Wilson v. Haun,* 97 Kan. 445, 155 Pac. 798; *Walker v. Eckhardt,* 122 Kan. 453, 251 Pac. 1093.)

And since sufficient evidence was adduced by defendants to make a *prima facie* case of impeachment against the note sued on, it devolved upon the plaintiff Fritchen to show that he acquired the note in due course—a burden he scarcely attempted to maintain. (*Security Co. v. Low,* 112 Kan. 153, 155, 210 Pac. 190; *Smith et al. v. Gregg,* 117 Kan. 507, 232 Pac. 217; *Reed Foundry and Machine Co. v. McVey,* 121 Kan. 461, 247 Pac. 628.) His participation in the meetings of the stockholders and directors where it was resolved to apply pressure on Mueller and where he and Lutgen were chosen as a committee to attend to that matter, his presence in Else's office when the ex-cashier was coerced into signing the note, the fair inferences properly deducible from the other attendant circumstances, including the fact of plaintiff's vice presidency and directorship of the bank itself, tend to show that Fritchen was aware of the acquisition of the note by the bank through coercion and duress, notwithstanding his asseverations to the contrary. Moreover, the fact that Fritchen testified that he was unaware of the circumstances under which the note was executed must be wholly disregarded in determining the propriety of an instructed verdict.

It is suggested, however, that defendants' answers were technically defective. If that were true it was altogether too late to urge such a point in behalf of an instructed verdict after the cause had been tried twice before a jury on the assumption that the pleadings sufficiently stated and joined the issues between the parties. Having been interpreted by court and counsel as sufficient to formulate and define the issues between the parties, and after the cause was fully tried out on that theory, the pleadings should have been

considered as informally amended to supply whatever was technically lacking. (*Hartwell v. Manufacturing Co.*, 78 Kan. 259, 97 Pac. 432; *Custer v. Royse*, 104 Kan. 339, 343, 179 Pac. 333; *Illinois Life Ins. Co. v. Young*, 118 Kan. 308, 321, 322, 235 Pac. 104.)

In *Beachy v. Jones*, 108 Kan. 236, 195 Pac. 184, it was said:

"When the trial court permits evidence to be introduced *in extenso* to support a defense to a promissory note, the pleading upon which such defense was intended to be based should be construed as if it sufficiently set out the facts or as if the issues had been enlarged by consent of parties." (Syl. ¶ 3.)

In *Lyons v. Petroleum Co.*, 114 Kan. 136, 215 Pac. 278, it was said:

". . . When an action has been fully tried and evidence received, although the facts were not pleaded or were insufficiently pleaded in the petition to warrant the introduction of such evidence, the pleadings should be considered as amended, or as broad enough to include those elements." (Syl. ¶ 2.)

In the instant case, however, defendants' pleadings were not even technically defective. It is urged that the answers did not contain a general denial. There was no occasion for a general denial, and such a recital in the answer would have been nonsensical. Where the defense to a promissory note is duress or a similar plea which amounts to confession and avoidance, technically correct pleading does not require a denial of its execution but does require that the answer state the facts constituting the duress whereby the execution of the note was effected. Concerning pleas in confession and avoidance, Phillips on Code Pleading says:

"69. . . . These are such as admit the facts alleged in the declaration, and avoid their legal effect by alleging other facts which show that the plaintiff either never had a right of action or that his right is barred by some supervenient fact. Pleas by way of confession and avoidance do not traverse the facts stated in the declaration. . . .

"70. . . . Pleas by way of confession and avoidance are usually divided into pleas in excuse, and pleas in discharge. . . . Of this class are, . . . duress, and the like. . . .

"71. . . . Every pleading by way of confession and avoidance must *give color;* that is, it must admit an apparent right in the opposite party, and rely on new matter to defeat such apparent right. A plea by way of confession and avoidance must, expressly or impliedly, concede that the plaintiff has, *prima facie,* a right of action. . . . For example, in an action for breach of covenant, if the defendant pleads a release, he admits the execution and the breach of the covenant, and so gives color to the declaration; and if the plaintiff replies that the release was obtained by duress, he impliedly admits the execution of the release, and thus gives color to the plea."

"235. . . . The defense of new matter, . . . does not deny any fact; without controverting any averment of the complaint, it asserts other facts which show that, notwithstanding the facts stated in the complaint, the plaintiff has not a right of action against the defendant. It proceeds upon the tacit admission that the issuable facts stated in the complaint are true. This is called 'giving color,' which is a prerequisite justification for introducing the new matter, and is a logical concomitant of this defense."

"240. . . . The answer of new matter in bar is essentially a plea in confession and avoidance; and like such pleas, it must *give color;* that is, it must admit, expressly or tacitly, that, independently of the matter disclosed in the answer, the plaintiff would have a right of action. . . . If such answer does not give color, there is no place for the new matter."

Touching the sufficiency of the facts adduced by defendants to prove duress, it seems clear that a *prima facie* defense of duress was sufficiently made out in behalf of both defendants to require that issue to be submitted to the jury under familiar precedents of this court. (*Hatch v. Barrett,* 34 Kan. 223, 8 Pac. 129; *Bank v. Hutchinson,* 62 Kan. 9, 61 Pac. 443; *Williamson v. Ackerman,* 77 Kan. 502, 94 Pac. 807. See, also, *Thompson v. Niggley,* 53 Kan. 664, 35 Pac. 290; *Graves v. O'Brien,* 111 Kan. 320, 207 Pac. 198; *Riney v. Doll,* 116 Kan. 26, 225 Pac. 1039.)

One of the suggested defects of defendants' answers, thus belatedly urged and erroneously sustained by the trial court, was that defendants did not plead that plaintiff had notice or knowledge of any infirmity in the note. What defendants did plead concerning notice by plaintiff was the following:

"That the plaintiff is one of the board of directors of the Home State Bank of Tipton, and had knowledge of all the facts hereinbefore set out, and alleges and says that if said note was transferred to the plaintiff it was done without consideration and for the purpose of transferring said note into the hands of another; that the only interest the plaintiff has in said note is in its collection for said Home State Bank, of which plaintiff is a director and officer; but says if plaintiff is a holder of said note for value, he is not an innocent holder, and took it subject to the defense herein pleaded."

Such an allegation of facts was quite sufficient to traverse plaintiff's allegation that he had acquired the note in due course. Indeed, it was not necessary for defendants to allege nor to prove this entire recital of facts. It was incumbent on them to prove the infirmity in the note. Then the burden shifted to the plaintiff to plead and prove affirmatively that he acquired the note in due course, without notice of the defense to which it was open. (*Beachy v. Jones,* supra.)

Counsel for appellee urge the point that Mueller paid interest

on the note, which might tend to show ratification after duress had ceased. But it was for the jury to say that duress had ceased when the interest was paid. The same answer may be made to the point that the mother-in-law made a statement of her assets and liabilities to the bank and that it mentioned the item of this note in controversy. Moreover, the mother-in-law's evidence tended to show that she did not intentionally make any statement to the bank admitting liability on the note nor intentionally do anything to waive her defense of duress.

The other matters noted in the briefs of counsel have been carefully considered, but they require no present discussion.

The judgment of the district court is reversed and the cause remanded for a new trial.