THE UNITED STATES BANKING COMPANY, *Appellee*, v.
ANNA WILSON VEALE, *Appellant*.

No. 16,954.

SYLLABUS BY THE COURT.

1. FOREIGN LAWS—*Necessity to Plead and Prove.* Foreign laws
differing from our own and relied on to support a cause of
action or a defense must be pleaded and proved.

2. SURETYSHIP AND GUARANTY—*Husband and Wife—Laws of
Mexico.* Under the proof it is held that in Mexico a wife may
become a surety for her husband and guarantee the payment
of his debts.

3. CONTRACTS—*Duress.* An obligation signed by a wife, in re-
newal of one given by her husband, by reason of a statement
of one who was a surety on her husband's obligation, to the
effect that if she did not then sign the obligation it would be
a great detriment to her husband and result in loss and dam-
age to him, is held, under the attending circumstances, not to
have been constrained by duress.

4. ——— *Same.* Ordinarily it is not duress to bring or threaten
to bring an action to enforce a valid obligation, nor to do that
which a party has a legal right to do.

Appeal from Shawnee district court. Opinion filed
March 11, 1911. Affirmed.

*Joseph G. Waters, John C. Waters,* and *Richard E.
Chism,* for the appellant; *R. W. Blair, H. A. Scan-
drett,* and *B. W. Scandrett,* of counsel.

*T. F. Garver,* and *R. D. Garver,* for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.:   The United States Banking Com-
pany, a corporation organized under the laws of the
Republic of Mexico and doing business in the City of
Mexico, brought this action against Anna Wilson Veale
to recover on a promissory note for 9243.57 pesos, and
another for 282.29 pesos, and also for interest and at-
torney's fees on each, stipulated for in case the notes

25—84 KAN.

were not paid at maturity. It was alleged that the pesos mentioned were of the value of fifty cents in legal tender of the United States. The defendant answered that the notes had been paid, that they were barred by the lapse of time, that there was no consideration for her signature, that she had no authority from her husband to sign her own name to the notes nor that of her husband, and that he had not since the signing of the notes consented to her action. She also alleged that John J. Judd, whose name is also signed to the notes, informed her that her husband's notes had fallen due at the bank "and that she must sign his name to the renewal note, and also sign the same herself, and if she failed to do so that it would be to the great injury, loss and damage of her husband; that, believing such statement to be true, she signed her husband's name to said notes, and also her own." The reply was a denial of the averments of the answer, and it contained a verified denial of the averment that Judd acted as the agent of the bank in procuring the signing of the notes.

When the cause came on for trial the parties submitted the following stipulation:

"A trial by jury of the general issues, and a general verdict from the jury, is waived, and all of the issues in this case submitted to the court; except the court, if he thinks the evidence warrants, shall submit to the jury the question of the execution of the note by the defendant under duress, and the finding of the jury upon that question shall be received and considered the same as the finding of the jury upon any question of fact in a law case."

A jury was called by the court, as to the charge of duress, but after the testimony had been received the trial judge determined that he was not warranted in submitting the question to the jury, and all the questions in the case were taken and decided by the court.

The evidence disclosed that appellant and her hus-

band, Walter J. Veale, were citizens of Kansas, but had been residing in the Republic of Mexico since the year 1896, and that while there he had become indebted to the appellee and had given his note for the debt, and that John J. Judd had signed it as surety. When the note became due Veale and Judd were both absent from the City of Mexico. Veale telegraphed Judd that he was unable to pay the note and requested him to intercede for and procure a renewal. Judd returned to the city before Veale did, which was several days after the note was due. He called on Mrs. Veale, and, according to her testimony, told her of the situation—that the renewal notes had to be signed that day, and when she inquired if he could not wait for the return of her husband he told her that it could not be postponed till her husband came home; that it would be a great detriment to her husband if it was not fixed that day, and so she went to the bank with Judd and signed her husband's name to the notes, and also signed her own name as surety. Mr. Veale returned to the city shortly after the execution of the notes and learned of the action taken, but it does not appear that he made any objection to the bank or to Judd in regard to the execution of the renewal notes, but, on the other hand, he repeatedly promised to pay them. About three years later he made a payment of $450 to the bank, for which a credit was given on the notes.

Although appellant did not plead the laws of Mexico relating to the capacity of a married woman to sign notes for her husband or herself, or to enter into contracts, testimony on the subject was received, and based on that the court found as follows:

"The law of Mexico at the time the notes in suit were executed was that the husband is the legal representative of his wife, and that, except in the cases provided by law, the wife can not obligate herself without the express authorization of her husband. The law of Mexico at the time the notes in suit were exe-

cuted further provided, as an exception to the law stated above, that a wife could obligate herself as a guarantor or surety for her husband.

"At the time the notes in suit were executed, and continuously to the date of trial, the law of Mexico was that if the husband expressly or tacitly ratified the acts of his wife no one could bring a suit for a nullity, a suit for a nullity being the remedy afforded by the Mexican law for the redress from a voidable contract.

"At the time the notes in suit were given, and ever since, the failure of the husband, with knowledge of the unauthorized action of his wife in personally assuming an obligation, to object thereto was a tacit ratification within the meaning of the Mexican law, and a voluntary payment on such obligation by him with such knowledge was an express ratification, and either such tacit or express ratification would validate such unauthorized act.

"Walter J. Veale returned to his home in the City of Mexico in two or three weeks after the execution of the notes by his wife, as narrated in finding No. 3, and was immediately notified of his wife's said action. No objection was ever made by said Walter J. Veale, or by anyone for him, to said bank, or to said Judd, or to any other person, on account of the said action of his wife in executing said notes, until after this suit was commenced, and said Walter J. Veale repeatedly promised and agreed to pay the same, giving his financial inability as his only reason for not doing so, and on January 21, 1907, did pay to said bank on said notes the sum of $450, Mexican, which sum was by the bank credited on said indebtedness and indorsed on said principal note."

On the findings of fact the court concluded that the appellant had legal capacity, under the laws of Mexico, to execute the notes, and that appellee was entitled to judgment for the amount demanded.

As to the capacity to execute the notes there is little ground for contention. It is true that the laws of Mexico, as proven, merge the individuality of the wife into that of her husband and give a married woman but few rights and privileges. The husband is the repre-

sentative of the wife, and he may ratify her acts, either
expressly or tacitly.   As the trial court correctly held,
there is an exception to the disqualification of women,
in that they may be sureties, "if they obligate them-
selves in respect of a thing which belongs to them-
selves or in favor of their ancestors, descendants or
husbands."   Here Mrs. Veale became a guarantor or
surety for her husband, and so far as the matter of
the consideration for her obligation is concerned the
agreement to extend the time of the payment of her
husband's indebtedness is a sufficient consideration for
her guaranty of its payment.   (*Fuller v. Scott,* 8 Kan.
25; *Winans v. Manufacturing Co.,* 48 Kan. 777; *Bank
v. Leslie,* 72 Kan. 401.)

The provision quoted is part of the civil code, which
provides for the marital relations of husband and wife
and which defines the powers and privileges of women.
Attention is called to a provision of what is termed the
commercial code, to the effect that a married woman
can not carry on commerce without express authority
from her husband, but, manifestly, this provision re-
lates to the running of a business on her own account;
that is, she can not be a merchant or storekeeper, or
engage in a particular branch of commerce, unless she
has the express authority of her husband.   It does not
apply to single transactions like that in question.   If
his consent and authority were necessary to her right
to execute the paper under the laws of that country,
their absence has been supplied and the defect cured.
Among the provisions relating to husband and wife
are the following:

"ART. 203.   The nullity of the acts of the wife,
founded on the want of a marital or judicial license,
can not be set up except by herself, by her husband, or
by the heirs of both.   If the husband has expressly
or tacitly ratified the acts of his wife, no one can bring
a suit for nullity.

"ART. 1677.   When the contract is null through 'in-

capacity,' intimidation, or error, it may be ratified on the defect or cause of the nullity ceasing, there being no other cause which invalidates the ratification.

"ART. 1678. The ratification and voluntary fulfillment of an obligation by means of payment, novation, or otherwise, executed with the same formalities, is held to be a ratification, and can not be impugned."

If the appellant could not bind herself without the consent of her husband, and if ratification was needed to give her act validity, he effectually ratified it when he made a voluntary payment of a substantial amount upon the notes. Under the provisions quoted, it is competent for him to ratify her contracts either for incapacity or for intimidation. The common law authorities cited by appellant on ratification are not applicable here, as this contract, having been made in Mexico, is to be interpreted and its validity determined by the laws of that country, and it is well known that the common law of that country is based on the civil and Spanish laws, and is something quite different from the common law of this country and of this state. As was said in De Sonora v. Casualty Co., 124 Iowa, 576:

"We know that Mexico was a Spanish province for about three hundred years, and then became, and still is, a republic. At no period of its history has it been under British sovereignty. Its institutions are Latin, not Anglo-Saxon, and the common law is not presumed to be in force in any state or country where English institutions have not been established." (p. 587.)

One of the witnesses who testified in regard to the law of ratification in Mexico stated that payment on a note was an active ratification of its execution, while a tacit ratification was a failure to object or contest it in the courts of the country. There was testimony, too, that under the laws of that country the husband is the legitimate representative of his wife, and that he

may ratify her acts expressly or tacitly, directly or indirectly, provided no third party is thereby damaged.

Complaint is made of the action of the court in refusing to submit to the jury the testimony relating to duress. It is doubtful whether, under the stipulation, there would have been error in such a refusal, even if substantial testimony of duress had been offered. It is a peculiar stipulation, wherein a general verdict is waived and wherein the court is vested with discretion to call a jury for the decision of a single issue. It does not provide that the court shall absolutely leave that question to the jury, but rather that it may do so if, after receiving and considering the testimony, it feels warranted in submitting it to the jury. The situation is somewhat similar to an equity case, where the court, at its option, may call in a jury for advice and to answer special questions of fact, and is then at liberty to approve or reject the answers as its judgment may direct.

But if it be treated as an absolute reservation of the right of a jury trial on that issue, no substantial error was committed by the court in taking the question from the jury. Under the circumstances of this case it can not be held that either the averments of the answer or the testimony of appellant shows that there was duress in the execution of the notes. Her husband's notes had matured in his absence, and Judd, a surety on the paper, had been telegraphed by him to intercede with the bank for an extension of the paper. He could obtain an extension by procuring her to sign the notes, and visited her for that purpose. The only averment of the answer which had the semblance of pressure or constraint was the statement that unless she signed the notes it would result in injury and loss to her husband. This result would necessarily follow if the holder of the note should begin proceedings to enforce the collection of the debt. In her testimony she stated that Judd told her that "it had to be fixed up

to-day; that it would be a great detriment to my husband, and I did n't know what might happen; to fix up the notes to-day; so I had to go with him." When she went to the bank to execute the notes, no objection was made by her to the signing of the paper, and it does not appear that anyone connected with the bank talked with her about the matter or even knew of the conversation between her and Judd prior to the execution of the paper. In view of the relations between the Veales and Judd, it can hardly be conceived that what was said by him operated to deprive her of the exercise of free will or to render her incompetent to contract. Friendly relations existed between the parties before and after the signing of the notes, and up to the time the action was brought. They visited together, but no complaint was made either by her or her husband that undue influence had been exerted upon her. She was an intelligent woman, had a bank account of her own, and drew checks upon the bank and was able to transact business for herself. To suggest that a failure to arrange for her husband's default would bring trouble and loss hardly amounts to a threat, and is little more than to say if the matter is not adjusted the bank will institute judicial proceedings, something which it had a right to do and something which she would know and expect. Duress "'is that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind and will of a person of ordinary firmness." (McCormick v. Dalton, 53 Kan. 146, 149.) It is not easy to say that Judd's conduct was wrongful or fraudulent, and still more difficult to say that it overcame her will or measured up to duress as defined by law. That neglect of the overdue debt would bring litigation and loss was doubtless anticipated without suggestion from anyone, and, ordinarily, it is not duress to threaten to do that which a party has a right to do; and even if the

by law." The bond given was for this sum. It would seem, therefore, that the only stay actually ordered was for ninety days from January 5, 1906.

On November 4, 1907, the appellant—the state of Kansas—filed a petition seeking to enforce the statutory lien upon the premises against the appellee, who was the alleged owner thereof. Service was had, or attempted, but such service was quashed December 21, 1908, on the motion of the appellee, who appeared specially for that purpose. On February 15, 1909, an amended petition was filed and service thereof was had by publication, the first publication being on February 18, 1909, the affidavit therefor being filed the same day. September 25, 1909, the appellee demurred to the amended petition, which demurrer was, on March 1, 1910, sustained, and the action dismissed. The state appeals.

It is insisted by the appellee that the cause of action on February 18, 1909, when the first publication was had, was barred by the statute of limitations, and that the amended petition failed to state facts sufficient to constitute a cause of action. His contention as to the first proposition is that the cause of action accrued on December 30, 1905, when Thomas was convicted, and that no action was really begun until February 18, 1909, which was more than three years from the date of conviction. Section 19 of the civil code provides that an action shall be deemed commenced as to each defendant at the date of the summons which is served on him, and, when service by publication is proper, at the date of the first publication; and that an attempt to commence an action shall be deemed equivalent to the commencement thereof, if followed by publication or service within sixty days. But such service or publication must be had before the limitation has run, in order to keep the cause of action alive. (*Dunlap v. McFarland, Adm'r*, 25 Kan. 488; *Insurance Co. v. Stof-*

fels, 48 Kan. 205; *Wester v. Long,* 63 Kan. 876; *Green v. McCracken,* 64 Kan. 330.)

The lien attaches, and, ordinarily, the cause of action accrues at the date of conviction, and is barred in three years. (*The State v. Pfefferle,* 33 Kan. 718; *Durein v. Pontious,* 34 Kan. 353; *Snyder v. The State,* 40 Kan. 543; *Karcher v. The State,* 80 Kan. 757.)

The appellant contends that the giving of the bond stayed all proceedings looking toward the enforcement of the judgment, both as to the appellee and as to Thomas, and that if there was no judgment to enforce against Thomas there was none to enforce against the appellee. The question thus presented is not free from difficulty. Was the judgment in abeyance for ninety days from the time of giving bond, as indicated by the order of the trial court, or was it suspended until affirmed? Or, more correctly speaking, was the lien of the judgment in abeyance and unenforceable during either of these periods so as to toll the statute of limitations, or was it from the date of conviction so continuously alive and vital as to keep the statute of limitations running?

The statute under which the appeal was taken (Crim. Code, § 287) provides that such appeal shall stay execution when the judgment is for a fine or fine and costs only; that in misdemeanor cases "the execution of the judgment" shall be stayed by order of the court or judge, upon the giving of a bond in such sum as shall be prescribed, that the stay shall be granted on serving the usual notice of appeal, and that the transcript may be filed in the supreme court at any time within ninety days after the rendition of the judgment, and not otherwise; that if the transcript is filed within the prescribed time "then the stay shall continue to be in force until the case is finally disposed of in the supreme court, but not otherwise." It will be seen that on giving bond execution only is stayed, and that doubtless means the

execution of the judgment against the person who has been convicted and is appealing. There is nothing in the statute indicating that the judgment or the lien thereof is either vacated or suspended during pendency of the appeal, execution only being stayed. This statute in language and effect is quite similar to section 586 of the civil code, which applies to civil actions and provides that an appeal shall not stay execution unless a certain bond be given. Hence a construction of the latter section should shed light as to the meaning of the former.

In *The State v. Volmer*, 6 Kan. 379, it was held that an appeal from a judgment of conviction, where the sentence was to pay a fine only, suspended the effect of the judgment until final judgment in the appellate court; but there it appears that the conviction had first been had in a justice court, and on appeal to the district court another conviction, the statute then providing, as it does now, that an appeal from conviction in a justice court should stay all further proceedings upon such judgment.

In *Soper v. Medberry*, 24 Kan. 128, the court said:

"On January 2, 1877, the case was decided by the supreme court, and the judgment of the district court was *affirmed*. The judgment of the district court was never disturbed in any manner or particular, but it was allowed to remain final, and just such a final judgment as is contemplated by said section 310 of the civil code. The mere taking of a case to the supreme court does not in any case destroy the judgment previously rendered therein; nor does it even suspend the operation of such judgment, unless a bond is also given for such purpose; and, if the judgment is affirmed, no new judgment is rendered, but the old judgment originally rendered remains intact, in full force and effect, and final. The principal question before the supreme court when a case is brought before it on petition in error is whether the judgment originally rendered in the case shall remain final, or whether it shall be reversed, vacated or modified; and where the supreme

court affirms the judgment, it determines that the judgment shall remain final. The judgment in this case remained a final judgment for more than one year, and even for more than two years, before the case was taken to the supreme court; and it remained a final judgment for more than one year while the case was pending in the supreme court. It remained a final judgment for more than four years altogether, before the said petition (this application) for a new trial was filed. We do not think that the petitioners filed their petition for a new trial in time, and therefore the judgment and order of the district court granting a new trial on such petition must be reversed." (p. 135.)

In *City of Miltonvale v. Lanoue*, 35 Kan. 603, it was held that, upon conviction before a police judge and afterward in district court for violation of a city ordinance, an appeal to the supreme court suspended the entire judgment, which was for fine and costs only. The court, in discharging the convicted person on habeas corpus, said:

"And always where an appeal is taken in such a case, the judgment itself with regard to the fine and costs is suspended pending the appeal. (*The State v. Volmer*, 6 Kan. 379, 384.) Indeed it is a general rule that an appeal suspends the judgment or order appealed from, and everything connected therewith, unless the statute in express terms or by the clearest of implications provides otherwise; and there is no statute providing otherwise in the present case. In an ordinary criminal prosecution, where imprisonment is imposed upon a defendant as a part of the punishment, then the statute provides that there shall be no stay of the execution of the judgment pending the appeal. (Crim. Code, § 287.) But there is no statute providing that there shall be no stay where the judgment imposes only a fine and costs. Hence a judgment imposing only a fine and costs must be stayed pending an appeal. And if the judgment for the fine and costs is to be stayed, it would seem to follow that all incidents thereof, all judgments or orders having for their object merely the enforcement of the judgment for the fine and costs, should also be stayed or be suspended pending the appeal. And clearly, we think, such is the case." (p. 605.)

In *Clarkson v. Hibler*, 39 Kan. 125, the petitioners were convicted of contempt in disobeying a subpœna, and it was held, upon the authority of *City of Milton-vale v. Lanoue*, 35 Kan. 603, that pending the appeal the entire judgment was suspended—that with regard to the imprisonment, as well as that with regard to the payment of fine or costs. There, as in the Lanoue case, the imprisonment was held to be no part of the penalty, but only a means of enforcing the penalty.

In *Bird v. Gilbert*, 40 Kan. 469, it was held that an appeal from an order adjudging an attorney guilty of contempt, and enjoining him from practice until purged of contempt, operated, where a stay had been duly granted, to restore to the appellant all his former privileges in court; but there the order expressly suspended judgment, and also stayed its further enforcement.

In *Willard v. Ostrander*, 51 Kan. 481, it was held that the filing of a petition in error and the execution of a stay bond did not destroy or suspend the effect of the judgment as evidence, nor as a determination of the rights of the parties, while the case was pending in this court. The action was brought to recover the value of certain sheep alleged to have been converted. Evidence was offered of the pleadings and judgment in another case tried in another county, which was then pending on appeal. The trial court refused to receive evidence of the supersedeas bond, holding that the judgment was in full force as an adjudication of the rights of the parties, notwithstanding the proceedings in error and the filing of this bond. Mr. Justice Allen, in the opinion, goes thoroughly into the reasoning and authorities and reaches the conclusion that the stay of execution has no other force or effect on the judgment than simply to prevent its enforcement by execution. After citing numerous authorities to the effect that the judgment itself is stayed, he cites numerous authorities

holding to the contrary, and quotes (p. 488) from
*Moore v. Williams,* 132 Ill. 589:

"An appeal from a decree does not destroy its opera-
tion as a former adjudication. It does not vacate the
decree, but simply suspends its execution. It leaves
the decree in full force as a merger of the cause of
action and a bar to further litigation." (Syl. ¶ 3.)

As to the hardship in some cases worked by this con-
struction he said:

"We are unable to find any language used by the
legislature which seems to us to imply that a stay of
execution has any other force or effect on the judgment
than simply to prevent its enforcement by execution.
On the contrary, as a determination of the rights of
the parties, it remains in full force pending the proceed-
ings here. It is apparent that this construction of the
law may work great hardship in some cases. The trial
courts, however, have ample power, when it is appar-
ent that injustice may be done, to grant continuances
until a case pending in this court, sought to be used
as a bar or estoppel, is determined, and it would seem
to us, where an appeal to this court has been taken in
good faith, and a sufficient bond to stay execution has
been given, that if the introduction of a judgment in
another case would have the effect, as in the case now
before us, to permit the party holding the judgment,
through the medium of another action, to collect that
judgment, that the trial court should always, on the
proper showing being made, continue the trial until
after the case pending here is determined. Only in
this way can full justice be done." (51 Kan. 489.)

In *Delay v. Yost,* 59 Kan. 496, it was held that the
statute of limitations runs against an action on a re-
plevin bond where proceedings in error are pending
but where no supersedeas bond has been given. It was
contended that the cause of action did not accrue until
the judgment in replevin was affirmed; that so long as
the action was pending, either in the district or in the
supreme court, the condition of the replevin bond duly
to prosecute had not been violated. But the court held
(p. 499) that the cause accrues upon the rendition of

the judgment, that the mere taking of the case to the supreme court does not suspend its operation unless a bond be given for such purpose, and that even the giving of such bond has no other force or effect on the judgment than simply to prevent its enforcement by execution, citing *Heizer v. Pawsey,* 47 Kan. 33, where it was held that proceedings in error and the giving of a supersedeas bond do not prevent the maintenance of an action upon a bond given to discharge the defendant from arrest in the original case, under the arrest and bail act.

In *McDonald v. Symns,* 64 Kan. 529, an attachment had been discharged by an order of a judge at chambers, and a proceeding in error operating as a stay of the order had been pending nearly five years when it was affirmed, and it was held that such proceeding in error and stay did not toll the statute of limitations as to a cause of action for the conversion of the property. The court said:

"The action to recover the property or the value thereof in replevin or for the conversion of the goods might have been maintained at any time after the wrongful seizure of the goods by the sheriff. . . . The stay resulting from the proceeding in error did not operate to suspend proceedings in the trial court further than to stay execution of the order sought to be reviewed. (*Heizer v. Pawsey,* 47 Kan. 33; *Willard v. Ostrander,* 51 Kan. 481; *Delay v. Yost,* 59 Kan. 496.)" (p. 532.)

In *Lisle v. Cheney,* 36 Kan. 578, it was held that a personal judgment in a foreclosure action is a lien on all the real estate of the debtor within the county, and attaches to after-acquired land therein, and that a stay of execution on such judgment does not operate to suspend the lien so that a third person can purchase land from the debtor during the stay, free from the lien. Commissioner Simpson in the opinion said:

"The lien thus created and declared by statute exists until the judgment becomes dormant, or is barred by

26—84 KAN.

the statutes of limitation. It is true that under section 468, it may become subordinate to the lien of some other judgment creditor, by failure to have execution issued and levied within a year after its rendition. . . . By operation of law a stay of execution is allowed in certain actions in which there is a waiver of appraisement. (Code, § 453.) Even this does not operate on the judgment or lien; it does not have the effect to impair the lien. If it is a first one, its seniority must be preserved by levy within the year. . . . It is a very common practice in this state to grant to the judgment debtors a stay of execution, and it has been done, without a claim ever having been asserted before that the lien of the judgment was suspended during the time of the stay; and while this fact is not conclusive, we cite it only for the purpose of showing that the construction we give the statute is the one that has been adopted and acted on by the bar for years. We conclude, therefore, that the stay of execution did not suspend the lien of the judgment in the foreclosure action of *Dunham v. Weaver,* so as to protect the plaintiff in error in his purchase of the land from Mrs. Weaver." (p. 587.)

In *Howard Ins. Co. v. Silverberg,* 94 Fed. 921, the court of appeals of the ninth circuit refers to a New York statute which provides that "an action shall not be maintained upon the undertaking given upon the preceding appeal until after the final determination of the appeal to the court of appeals" (p. 925), and said:

"By implication, the statute permits such an action, in the absence of an undertaking to stay the execution, and it accords with the practice prior to the adoption of that provision of the code." (p. 925.)

But our statute neither in terms nor by implication gives any effect to a stay other than the suspension of the right to issue execution. In *State of Iowa v. Mateer,* 105 Iowa, 66, one had been convicted and sent to jail for selling liquor, and the governor, under his power to pardon and "remit fines and forfeitures," ordered a suspension of the further execution of the judgment. It was held that an action to enforce a lien

against the premises where the sales had been made could not be maintained so far as the fine was concerned, so long as the governor's order remained unrevoked, but that this was not true as to the costs. It was held in *Johnson v. Williams &c.*, 82 Ky. 45, that after a judgment has been superseded by the debtor the creditor can not bring an action upon it and protect it by suing out an attachment against the debtor's property. This ruling was referred to in *Cavanaugh v. Britt*, 90 Ky. 277, where it was also stated that the statute itself provides that "in all cases where the doing of an act necessary to save any right or benefit is restrained or suspended by injunction, *or other lawful restraint*" (p. 277), the time covered by the restraint shall not be estimated in the application of the statute of limitation.

We have thus far treated the stay as beginning on January 5, 1906, when the bond was filed. However, from the language of the order made by the trial court (not the order recited in the bond) we are inclined to believe that it was intended thereby to grant a stay to begin at once, the bond to be filed within a reasonable time. Very likely the matter was thus treated and considered by the trial court and by the parties. Assuming that the stay began upon conviction, we need not consider the effect of filing the bond after the statute of limitation had begun to run, and we conclude that the stay did not operate as a bar to the prosecution of this action to enforce the lien. While the rule might be considered provocative of hardship, such hardship is more theoretical than actual. Had this action been begun before the judgment was affirmed, no doubt the trial court would have granted continuances from time to time until the appeal was determined, and we must presume that trial courts will under such circumstances act, not arbitrarily, but with discretion, so as to save the rights of the state and yet not destroy the rights of the other party.

The judgment of the trial court is affirmed.