Riney v. Doll.

---

No. 24,940.

IRA RINEY, *Appellee*, v. C. E. DOLL et al., *Appellants*.

SYLLABUS BY THE COURT.

1. NOTE AND MORTGAGE—*Defense of Duress—Threats Insufficient to Constitute Duress.* A threat in the alternative to give one a beating at some remote, future, indefinite time is not such a threat of personal violence as will constitute duress.

2. SAME—*Duress.* It is not duress for one to threaten to take such legal proceedings as the law affords to recover damages for claimed injuries.

3. SAME—*Duress—Threat Not a Threat of Criminal Prosecution.* A threat by one who claims damages from another to prosecute him to the full extent of the law is not tantamount to a threat of criminal prosecution.

4. SAME—*Threats Amounting to Duress.* Threats of personal violence or of criminal prosecution to amount to duress must be of such a character or made under such circumstances as to destroy the will of the one threatened to such an extent as to compel him to act in a manner contrary to his will and to his detriment.

5. SAME—*Instruction Relating to Duress.* An instruction that threats of criminal prosecution must be of such a character as to overcome the will of a person of ordinary firmness is erroneous, but, held, under the facts in this case, not to constitute reversible error.

Appeal from Seward district court; CHARLES E. VANCE, judge. Opinion filed May 10, 1924. Affirmed.

*J. W. Davis,* of Greensburg, for the appellants.
*G. L. Light,* and *F. O. Rindom,* both of Liberal, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is an action on a promissory note and to foreclose a mortgage. The defense was duress. It was tried to a jury, verdict and judgment for plaintiff, and defendants appeal.

Riney owned an automobile which he took to Doll, a car painter, to be painted. Without authority to do so Doll drove the car on a trip, had an accident and damaged the car. Riney asked Doll to

Riney v. Doll.

pay or settle the damage. At the time Riney was quarantined at home because of scarlet fever in his family and he told Doll to settle with an attorney whom he named. Doll employed an attorney. After some bickering the two attorneys and Doll got together and agreed upon the settlement. In effect they agreed that the car was worth $1,400 before Doll damaged it, and Doll and his wife executed a note to Riney in that amount and secured the same by a second mortgage upon real property. Doll did not want to keep the car, so an agreement was drawn and signed by the attorneys by which Doll was to take the car to certain mechanics and have it repaired. Then Doll was to paint it and sell it, Riney to assist in effecting a sale, and the proceeds were to be applied, first, to pay the mechanics for making the repairs, and the balance upon the note to Riney. This was done, and this suit was brought to recover the balance due upon the note and to foreclose the mortgage.

The defendants filed separate answers, admitted the execution of the note and mortgage and that the same was not fully paid, but averred that they were executed under duress. On that point Doll's answer alleged that "plaintiff called upon the defendant and presented him with the contract, note and mortgage set forth in the petition. . . . At that time . . . plaintiff . . . demanded that they sign the same immediately and stated to these defendants that if they failed or refused to sign the same, he would have the defendant, C. E. Doll, criminally prosecuted. The plaintiff further threatened the defendant with physical violence; and the defendants, believing that if they did not sign the said contract, note and mortgage, the plaintiff would carry out his threat of instituting criminal proceedings and of doing the defendant bodily injury." The answer further avers that had it not been for fear of prosecution and physical violence he would not have signed the contract, note and mortgage, and further, that the amount was greatly in excess of the damages to the car and was unconscionable and unjust. The separate answer of Mrs. Doll averred that at the time she signed the note and mortgage she was advised that plaintiff had made threats to her husband to have him criminally prosecuted and had also threatened him with personal violence and that she feared the threats would be carried out and this was her sole reason for signing the instruments. The reply was a general denial.

The evidence disclosed that the car was damaged the morning of October 12. Doll saw Riney that day and told him he wanted to

pay the damage he did to the car. The note, mortgage and contract were drawn at the office of plaintiff's attorney late in the afternoon of October 15. The persons present at that time were plaintiff's attorney, Doll, and his attorney. Riney was not present; neither was Mrs. Doll. Doll signed the note and mortgage at that time and his attorney took them to Doll's residence, where they were signed by Mrs. Doll without objection. Neither Riney nor his attorney was present. She had never talked to Riney and did not know him. There is no claim that Riney's attorney made any threats of any character which induced the execution of the instruments. In fact, the evidence is that plaintiff's attorney asked Mr. Doll to get an attorney to look after his interest, that he might be fully protected.

The evidence concerning duress is substantially as follows. Doll testified that on October 15:

"I went down to Mr. Riney's house about eleven o'clock and Mr. Riney came out of the house. . . . We talked about his car and he told me this was only a second mortgage and he wanted a mortgage on the other place. I told him my wife would not listen to that. I started to go to the car and Mr. Riney said: · 'I am not through with you.' And he reached in and shut the car off. He said: 'Any man that takes another man's car out like you did and wrecks it is a d—— dirty dog as ever lived.' He said: 'I will prosecute you to the fullest extent of the law if you do not fix that deal up with Mr. Light at his office, and then if I cannot do anything with you I will beat the soup out of you.' ·

He further testified:

"I made up my mind to sign it because of the threats. Q. What was you afraid of. A. I was afraid he would fulfill his statements. Q. What was you afraid of. A. I was afraid he would beat the soup out of me and get out a criminal action against me. . . . He looked me straight in the face. I thought he was going to hit me any minute. He said he would beat the soup out of me. Q. When did you first become frightened and scared of Mr. Riney. A. When he hollered that he was not through with me. . . . Q. Did Mr. Riney make any threats or do anything except shut off the car that day you were up to his house. A. Yes, sir, after he shut off the car he had his fist up there and I thought he might hit me. I told him I was in no shape and commenced to beg him not to hit me. He said, 'I won't do it now, but I will afterwards.'"

This testimony is corroborated in part by defendant's son, Cecil Doll, who was with him. The evidence is that these threats were communicated to Mrs. Doll by her husband (though that testimony was later withdrawn) and by the son. Mr. Doll's attorney testified that he had objected all the time to that kind of a contract being drawn because he thought it was not to Doll's best interest; that the

Riney v. Doll.

damages were too high; that he did not tell Doll not to sign it, but it was not his way of a settlement, he wanted to see what the damages were; that at the time the contract, note and mortgage were signed Doll did not appear to be nervous and excited, although prior to that time he had been and seemed to be worried about something.

At the close of the testimony plaintiff demurred to the evidence as not being sufficient to show duress because of a threat of personal violence nor because of threats of criminal prosecution. The court thought there was enough evidence to go to the jury on the question of threat of imprisonment and overruled the demurrer on that point, but sustained it so far as it went to the question of threats of personal violence, but he did not strike out the testimony pertaining thereto, permitting it to go to the jury for whatever light it might throw upon the defense of duress by threatened imprisonment. The evidence on behalf of plaintiff contradicted defendant's evidence as to any threats, but we have stated that most favorable to the defendants, as shown by the abstract.

Appellant complains, first, that the court sustained the demurrer as to the threats of personal violence. It will be noted that the only threat of personal violence made by Riney was in the alternative— in the event he could not get redress by law—and in the future, after he had first tried redress by law, which would necessarily mean some time—several months or possibly two or three years. This was about eleven o'clock in the morning. The papers were not drawn nor executed until five or six o'clock in the evening. There was no evidence of threatened imminent personal violence when the papers were drawn and executed. The court did not err in taking this question from the jury. (*Gabbey v. Forgeus, Adm'r,* 38 Kan. 62, 15 Pac. 866.)

Appellant further complains of the court's second instruction, defining duress, which reads:

"You are instructed that the defense pleaded by the defendants is what is generally termed 'duress' and duress is defined as that degree of constraint or danger, either actually inflicted, or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind of a person of ordinary firmness."

This definition of duress was taken evidently from the opinion of this court in *McCormick v. Dalton,* 53 Kan. 146, 149, 35 Pac. 1113, and quoted with approval in *Banking Co. v. Veale,* 84 Kan. 385, 392, 114 Pac. 229, and is one which has been used on recent occasions by the courts of other states. (*Wood v. Telephone Co.,* 223 Mo. 537;

*Kline v. Kline,* 14 Ariz. 369), and was formerly quite generally recognized as correct. (*Ex parte: William Wells,* 59 U. S. 307; *James & Haverstock v. Dalbey,* 107 Iowa 463; 2 Greenleaf on Evidence, 16th ed. § 301; 9 R. C. L. 714.) The courts now generally recognize that this definition is inaccurate for at least two specific reasons, viz.: first, experience has furnished no yard stick by which the firmness of the human will can be measured, and second, even though that could be done, one having a weak will is as much entitled to the protection of the law as though his will were' of ordinary firmness or of extraordinary firmness. When one uses the bludgeon of duress to break the will of his adversary and thereby gains a wrongful or unconscionable advantage, a court will relieve the victim of the consequences of the act he was thus forced to perform, whether his will be weak, requiring but one blow to shatter it, or whether it be of ordinary firmness requiring several, or whether it be as adamant requiring many.

The courts now quite generally recognize the inaccuracy of defining duress by applying it to a person of ordinary firmness. In 9 R. C. L. 716, it is said:

"By many if not most of the modern authorities, however, the true doctrine of duress is held to be that a contract obtained by so oppressing a person by threats regarding the safety or liberty of himself, or of his property, or of a member of his family, as to deprive him of the free exercise of his will and prevent the meeting of minds necessary to a valid contract, may be avoided on the ground of duress, whether the oppression causing the incompetence to contract be produced by what was formerly deemed duress, and relievable at law as such, or wrongful compulsion remediable only by an appeal to a court of equity. According to this view, what constitutes duress is matter of law; whether duress existed in the particular transaction is usually matter of fact, though of course the means may be so oppressive as to render the result an inference of law. There is no legal standard of resistance with which the person acted upon must comply at the peril of being remediless for a wrong done to him, and no general rule as to the sufficiency of facts to produce duress. The question in each case is, Was the person so acted upon by threats of the person claiming the benefit of the contract, for the purpose of obtaining such contract, as to be bereft of the quality of mind essential to the making of a contract, and was the contract thereby obtained? Under this theory duress is to be tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim. The means used to produce that condition, the age, sex, state of health, and mental characteristics of the alleged injured party, are all evidentiary, merely, of the ultimate fact in issue, of whether such person was bereft of the free exercise of his will power. Obviously what will accomplish this result cannot justly be tested by any other standard than that of the particular person acted upon. His resisting power, under all the circumstances of the situation, and not any arbitrary standard, is to be considered

in determining whether there was duress." (See, also, *Knight v. Brown*, 137 Mich. 396; *Nebraska Mutual Bond Ass'n v. Klee*, 70 Neb. 383; *Price v. Bank of Poynette*, 144 Wis. 190; *Radich v. Hutchins*, 95 U. S. 210; *Bank v. Loos*, 142 Iowa 1; *Sulzner v. C.-L. & M. Co.*, 234 Pa. St. 162; *Wilbur v. Blanchard*, 22 Idaho 517.)

This court recognized this distinction in *Williamson v. Ackerman*, 77 Kan. 502, 94 Pac. 807, and thoroughly committed itself to the modern definition of duress, and quoting approvingly from *Galusha and another v. Sherman and others*, 105 Wis. 263:

"There is no legal standard of resistance which a party so circumstanced must exercise at his peril to protect himself. The question in each case is, Was the alleged injured person, by being put in fear by the other party to the transaction for the purpose of obtaining an advantage over him, deprived of the free exercise of his will power, and was such advantage thereby obtained?" (p. 505.)

Also in *Milling Co. v. Gas & Electric Co.*, 115 Kan. 712, where it was said:

"We have traveled far from the common law duress of bodily imprisonment or fear of loss of life or member or of imprisonment, to the modern doctrine of involuntary payment. There must be unlawful coercion; but we are no longer restricted to goose flesh producing agencies, and the mythical man of ordinary courage and firmness is no longer invoked as a standard." (p. 715. See, also, *Bank v. Bay*, 90 Kan. 506, 507, 135 Pac. 584, and *Bank v. Francis*, 100 Kan. 225, 230, 164 Pac. 146.)

Indeed, as early as 1887 in *Gabbey v. Forgeus, Adm'r*, 38 Kan. 62, 15 Pac. 866, this court approved instructions set out in full in the opinion (pp. 65 to 67) giving the test for duress in conformity to the so-called modern definition. Though the definition of duress given by the court is erroneous, it does not necessarily follow that the giving of it constitutes reversible error. In this case there is no intimation in the record that defendants are not persons of ordinary firmness. If they are, the instruction was correct as applied to them, though inaccurate as a general definition of duress. If they are persons of extraordinary firmness the instruction is favorable to them and they cannot complain. By not showing that they do not measure up to the standard of a person of ordinary firmness defendants have not shown that the instruction was erroneous as to them and cases are not reversed in this court unless error is shown. But we shall not base our decision on this point, for to do so would recognize that the term "a person of ordinary firmness" has a definite practical meaning, which the modern authorities deny. Perhaps the reason the modern authorities deny the existence of the

mythical man of ordinary firmness is not so much from the lack of the power of courts to create and define such an individual if by so doing the ends of justice would be better promoted—just as we have the man of ordinary prudence in negligence cases—but because of his uselessness in the administration of justice. His presence in court is to defeat justice in a case where the victim of duress does not have sufficient will power to measure up to that standard and such a person is entitled to the protection of a court as much as any one. Indeed, a court of equity should be even more solicitous of a wrong to a person of weak will or mentality.

But let us examine this threat of prosecution as testified to by Doll, the only witness who pretends to quote it. Riney is quoted as saying to Doll, if you do not fix this up with my attorney "I will prosecute you to the fullest extent of the law and then if I cannot do anything" I will give you a beating. Obviously this is not equivalent to a threat of criminal prosecution. It should be remembered that Djoll had damaged Riney's car under circumstances which caused Riney to think Doll was liable to him for damages to the amount of the injury, and this much Doll had previously admitted to Riney when he talked with him October 12. On the 15th the talk was about how to fix it up. Riney complained about Doll giving him a second mortgage and wanted a mortgage on another place. It may be noted that whatever Riney's threats were they were not sufficient to overcome Doll's will as to the kind of mortgage he gave, for when he settled with Riney's attorney that evening he gave a second mortgage, the kind he wanted to give when he talked to Riney and the kind Riney told him he did not want. Riney's threat was if you do not fix this up with my attorney "I will prosecute you to the fullest extent of the law," which is equivalent to saying that he would use whatever provisions of the law were available to him, and that is accompanied by a suggestion that he was uncertain what could be done by legal proceedings. Riney, of course, had a right to use whatever provisions of the law were available to him. It is not duress for one person to threaten another that he will use the law in so far as it is applicable to accomplish what he regards to be his rights. This question has been thoroughly settled, not only by our own court, but by the courts generally. (See *Kiler v. Wohletz,* 79 Kan. 716, 720, 101 Pac. 474; *Banking Co. v. Veale,* 84 Kan. 385, 393, 114 Pac. 229; *Kimball Co. v. Raw,* 7 Kan. App. 17, 19, and cases cited.)

It is true that Doll testified that he was afraid Riney would get out a criminal action against him, but that is not what Riney told him. He at no time mentioned a criminal action. Under this evidence the court would have been justified in sustaining a demurrer. Not having done so, but having submitted the case to the jury, the fact that the .court gave an instruction inaccurate as applying to duress generally though possibly accurate as applying to this particular case, would not justify this court in ordering a new trial.

Finding no material error in the record the judgment of the court below is affirmed.