No. 34,461

Benjamin A. Ogle, *Appellee*, v. Mabel Freeman et al., *Appellants.*

(96 P. 2d 670)

Opinion filed December 9, 1939.

*George Barrett, Robert G. Miller,* both of Pratt, and *A. M. Fleming,* of Garden City, for the appellants.

*William B. Hess, E. R. Barnes* and *Myron S. Steere,* all of Pratt, for the appellee.

The opinion of the court was delivered by

Hoch, J.: This was an action to cancel a deed on the ground that it was executed under duress. Plaintiff prevailed, and defendants appeal.

The principal question presented is whether under the facts disclosed by the evidence it must be said as a matter of law that duress was not shown.

On September 4, 1926, Benjamin Ogle married Mary A. Barnes, who was the mother of twelve grown children. They lived together for some time, and on September 17, 1930, while Ogle was out of the state, she obtained a divorce from him in Gray county, Kansas. In January, 1931, and before the effective date of the divorce—six months after the decree was entered—Ogle returned, and they began living together as husband and wife without a remarriage, and this continued until her death on August 14, 1933. Mrs. Ogle's father, F. M. Gilmore, was then living and was a man about ninety years of age. A few days before Mrs. Ogle's death, and while she was critically ill, she told her father that she wanted her husband to

have her property and had so provided in a will. He suggested that she execute a deed to the farm on which they were living, to, her husband, together with a bill of sale of the personal property. This was done, the deed conveying to Ogle a life interest in the farm. On August 22, 1933, eight days after Mrs. Ogle's death, Ogle executed a deed conveying his interest in the farm to the living sons and daughters of his deceased wife, who are the defendants in this action. On October 30, 1934, Ogle filed a petition asking cancellation of the deed on the ground that it was executed under duress. An amended petition was filed on February 3, 1936, and a second amended petition on March 20, 1937. The case was heard in June, 1938. Defendants demurred to plaintiff's evidence and the demurrer was overruled. Following the defendant's testimony the court took the case under advisement, and on November 14, 1938, judgment was rendered for plaintiff, and the deed executed by Ogle ordered canceled. Motion for new trial was made and overruled.

Appellants contend that plaintiff's evidence falls short of establishing duress as a matter of law, and that plaintiff's failure to offer to place the defendants in status quo makes his evidence demurrable.

Ogle testified that a few days after his wife died he had a conversation with Amos Barnes, one of the sons of his deceased wife, and that Barnes told him he "had better go and see grandfather." He said that a day or so afterwards he went to see Grandfather Gilmore at his home in Coats. This was three or four days after his wife's death, and no one was present but himself and Gilmore. He testified further:

"Mr. Gilmore asked me if it was true that I lived with Mrs. Barnes and I told him I had and *he became very angry. He told me it was a penitentiary offense to live that way, so he said the best thing I could do was deed the property in question back to his grandchildren and leave the country.*

"He said his grandchildren had been in a few days before. He said Harve had affidavits and papers from Cimarron, Kansas, to show the divorce decree. *His talk put the fear in me. I was afraid of prosecution so I went to see the oldest daughter, Mrs. Freeman, and told her I would settle it up.*

"*I gave them a deed for my life estate and let them have their property. I got nothing out of it.*

"I saw an attorney about the situation about the middle of June, 1934. During that time I was in fear of prosecution. I never had a lawsuit before.

"*The deed was drawn in the Peoples Bank, at Pratt. I did not have anything to do with the dictating of it. All I done was sign the deed.* Amos Barnes, Harve Barnes and Howard Freeman were present. After making this reconveyance back to the defendants in this case I went to work on a farm

for Harve Bryant. Later on I went out to Cimarron, Kansas. I came back to Pratt and stayed until 1935 and I have been at Garden City since 1935. I told the court that I made the deed so I could leave the country. I stayed out at Cimarron two or three months after I made the deed.

*"I would not have made the deed in question if F. M. Gilmore had not told me that living with my wife was a penitentiary offense."*

Gilmore testified, in part, as follows:

"Q. State whether or not Ben Ogle married a daughter of yours. A. He was supposed to have, but I could not swear to it. . . .

"Q. I will ask you whether or not you advised Mary Ogle as to business matters during her lifetime? A. In that one instance I did, in regard to that property up there.

"Q. What do you have reference to? A. Well, about giving Ben Ogle her property—making him a deed to the place and giving him the personal property.

"Q. When did you talk with Mary Ogle, your daughter, in regard to her farm, the northwest quarter of section twenty, township twenty-eight, range fourteen, in Pratt county, Kansas? . . . A. Well, as I told you awhile ago, it was shortly before her death, just a little while before her death.

"Q. What did she say about her property, if anything. A. Said that she wanted to give it to Ogle; that he had been good to her and that he ought to have it and that she had made a will giving it to him.

"Q. During that conversation shortly before her death, what, if anything, was said about a will? A. Yes; she said she had made a will.

"Q. Well, what did you say about the will? Was anything further said about it? A. I told her the will could be torn up easier than a deed. That she had better make him a deed to the place and a bill of sale to the personal property.

"Q. Do you know what kind of a deed or conveyance was talked about at that time? A. A lifetime deed was what I advised her to make; deed 'it to him during his lifetime, then the property go back to her heirs, her heirs, not his. That is what I told her.

"Q. What was the condition of her mind at that time, if you know? A. I think it was all right; she was just as rational as she ever was.

"Q. I will ask you whether or not, Mr. Gilmore, you had a conversation with Amos Barnes and Harvey Barnes shortly after the death of your daughter, Mary Ogle? . . . A. Yes, right out there on the porch.

"Q. Who was present? A. I don't think there was anyone.

"Q. Well, your grandchildren were present, weren't they, Harvey and Amos? A. Yes, they was the ones doing the talking.

"Q. What was said, if anything, by Harvey or Amos, and what did you say, if anything? A. I couldn't tell you a word I said, Barnes. They talked about the divorce and so forth.

"Q. Who did? A. Amos and Harvey; they talked about the divorce papers. They had gone out and investigated and found that they was divorced.

"Q. Who did they mean were divorced? A. Mary and Ogle.

"Q. State whether or not anything was said about having certificates and affidavits from out there showing they were divorced? A. Yes.

"Q. Who said that? A. Harvey and Amos.

"Q. State whether anything was said relative to Amos and Harvey making an investigation of the facts out there at Cimarron? A. Yes; they said they had.

"Q. Did they purport to have some certificates or affidavits? A. Harvey had some papers; he said he got them from the probate judge.

"Q. Where was that; what probate judge? A. The probate judge at Cimarron.

"Q. State whether or not Amos and Harvey seemed to be quite worked up or agitated about the matter? A. Oh, I don't know as I could—oh, I don't know as I could say they were. They seemed kind of natural.

"Q. You may state whether or not, Mr. Gilmore, these boys, these grandsons of yours informed you in this conversation that it was a penitentiary offense for the Ogles to live together that way? A. No, they didn't say that.

"Q. State whether or not Ben Ogle came and talked with you the next morning or shortly after you had talked with your two grandsons? A. Yes, he came here and we had quite a talk.

"Q. Where did that talk take place? A. Out there on the porch.

"Q. What did you say, if anything, to Ben Ogle? A. Well, we was a talking about that business out there at Cimarron. *I told him it was a penitentiary offense for them to live as they had been.*

"Q. What do you have reference to? A. Well, about their divorce, the trial in probate court out there. She had got a divorce out there from him.

"Q. That was your daughter? A. Yes.

"Q. And what was it you told him? A. *I told him it was a criminal offense and we could put him in the pen for it.*

"Q. State whether or not you told Ben Ogle that Harvey and Amos had been to see you and had shown you affidavits and certificates showing that Ben and Mary Ogle had been divorced and had not been married again? A. They told me that, but did not show me any papers.

"Q. You told Ben Ogle they had been there, didn't you? A. Yes, I think so.

"Q. Did you further tell him that the boys were going to cause some trouble about that deal? A. No. I don't think I did. I don't think I told him that. I don't remember.

"Q. *Well, how did you talk to Ben that day?* A. *Oh, I talked pretty rough, I guess.*

"Q. At that time did you have good eyesight? A. Yes, my eyes were all right then.

"Q. *What effect did your talk with Ben Ogle seem to have, if you could tell?* A. *Well, he seemed to get excited.*

"Q. Now to go back to the day before, when you had a talk with Amos and Harvey about the domestic relations of your daughter Mary, and Ben Ogle, state whether or not at that time Amos asked you if Ben owed you any money? A. If what?

"Q. If Ben owed you any money? A. I don't know whether Amos asked me that or not, but there was talk about that, along that line. Amos said he would pay it.

"Q. What did you say? A. I expect I told Amos that Ben owed me about twenty-one dollars, and Amos said he would pay it.

"Q. Well, why did Amos offer to pay that; do you know? A. Well I think I told him that I was going up there and get the lumber off that section twenty, and he said he would pay it; I'm not sure.

"Q. Had you had some business dealings with Ben Ogle before your daughter's death? A. Yes.

"Q. What, if any? A. Well, I sold him quite a lot of lumber and had him hired to help tear down a building up there. I guess that was all. I gave him the foundation that was under the building for filling up the basement.

"Q. Do you know what Mr. Ogle did with this lumber? A. He built some chicken houses with it; didn't use part of it.

"Q. Now, when you were talking with Amos and Harvey before you talked to Ben Ogle, *you say that Amos said he would pay you this $21 balance that you had coming from Ben Ogle?* A. *Amos said he would pay the $21 back,* but I don't know whether it was before or after I had had the talk with Ben.

"Q. How did this talk come up,—No. How did this conversation come up about the improvements on the farm, about lumber? A. I don't know. I suppose we were talking about the lumber and I told him I was going to go and get it if it was not paid for, and he said he would pay for it, but he never did. . . .

"Q. *They went over this matter of your daughter Mary and Ben Ogle living together after their divorce pretty carefully, didn't they?* A. *Yes, they talked about it. Harve did most of the talking,* I don't think Amos said but very little.

"Q. Did they at that time inform you that Mary had deeded this farm in question over to Ben? A. No, I don't think so. We all knew that. There wouldn't have been any use to tell me that. I already knew it.

"Q. You knew that because you had advised it? A. I advised her to do that if she wanted the property to go that way; it was hers, and she should do what she wanted to with it.

"Q. Did these grandsons say anything to you about seeing Ben Ogle about the matter? A. I don't think they did, I don't know."

*Cross-examination:*

"Q. You do not remember very much about this circumstance they have asked you about, do you, Mr. Gilmore? A. I had not been studying anything about it, but I heard it mentioned and can remember it.

"Q. Who mentioned it first to you? A. Well, when we were talking about it here, just now.

"Q. There was nothing you said to Ben to make him frightened or afraid of you, was there? Nothing to cause him to be alarmed? A. *Well, there was nothing to make him afraid of me, but probably something to make him afraid of getting punished.* . . ."

*Redirect examination:*

"Q. Ben Ogle never did make his home with you, did he? A. No.

"Q. You still think that what you said to Ben Ogle might have frightened him don't you? A. Might have what?

"Q. Might have frightened him, scared him? A. What do you mean?

"Q. *You still think, don't you, Mr. Gilmore, that after you had talked with Ben Ogle that he might have been frightened or worried about what you told him? A. Yes, I know he was.*" (Italics ours.)

Was this testimony sufficient to support a finding of duress?

This court and many others have shown a tendency toward liberality of definition—that is, to relax the rigid requirements of the older rule concerning duress. It was said in *Williamson v. Ackerman,* 77 Kan. 502, 94 Pac. 807: "Under the modern theory duress is to be tested, not by the nature of the acts or threats, but rather by the state of mind of the victim induced by such acts and threats." (p. 505.) (See 9 R. C. L. 716, 717.) Again, the old rule, frequently stated, was that "duress is that degree of constraint or danger, either actually inflicted, or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind of a *person of ordinary firmness.*" In a carefully considered opinion in the case of *Riney v. Doll,* 116 Kan. 26, 225 Pac. 1059, this court repudiated the proposition that *ordinary firmness* of mind should be included in the standard by which to test the existence of duress. It forcefully argued that if a person imposed upon by use of threats had a mind of less than "ordinary firmness" he was all the more entitled to be protected. The court said:

"The courts now generally recognize that this definition is inaccurate, for at least two specific reasons, viz.: First, experience has furnished no yardstick by which the firmness of the human will can be measured, and second, even though that could be done, one having a weak will is as much entitled to the protection of the law as though his will were of ordinary firmness or of extraordinary firmness. When one uses the bludgeon of duress to break the will of his adversary and thereby gains a wrongful or unconscionable advantage, a court will relieve the victim of the consequences of the act he was thus forced to perform, whether his will be weak, requiring but one blow to shatter it, or whether it be of ordinary firmness requiring several, or whether it be as adamant, requiring many.

"The courts now quite generally recognize the inaccuracy of defining duress by applying it to a person of ordinary firmness." (p. 30.) (See earlier cases and authorities there cited.)

Was there substantial evidence that Ogle, whatever degree of "firmness of mind" he may or may not have had, was so put in fear of prosecution that he was robbed of the free exercise of his will, and under such influence, executed the deed? Certainly there was evidence that he was badly scared by what he reasonably believed

was a plain threat of prosecution. Grandpa Gilmore told him that "we could put him in the pen" and suggested that he had better deed the farm to the sons and daughters of his deceased wife and leave the country. Grandpa testified that Ogle might not have been put in fear of him, but was scared and probably afraid of being punished. Ogle proceeded to visit one or more of the defendants, and in their presence the deed was made out by someone else, at the bank. Without receiving anything for doing so he parted with his life interest in the farm, which his wife had desired him to have. If the grantees, who were paying nothing for the grantor's life interest in the farm, had no knowledge of the threats they must have thought that Ogle's action was a rather unusual proceeding.

But it may be said that the testimony discloses that there was no definite and unequivocal threat that prosecution would follow if the deed were not given, or that giving of the deed would avoid prosecution. But the trial court was the trier of the facts, and certainly it cannot be said that no inference could reasonably have been drawn that a definite threat of prosecution had been made. (*Smith v. Bank*, 90 Kan. 299, 133 Pac. 428.)

It was held by this court in the case of *Fritchen v. Mueller*, 132 Kan. 491, 498, 297 Pac. 409, that where a prima facie case of duress is made out the issue must be submitted upon the sufficiency of the facts to establish it. We cannot say on the evidence in this case that no facts were shown from which the trial court could conclude that the mind of Ogle had been so disturbed by threats of prosecution that in executing the deed he was not exercising his free will.

In *Graves v. O'Brien*, 111 Kan. 320, 207 Pac. 198, it was said that "A case of duress is made out where there is a fear of prosecution or imprisonment, excited by threats." (p. 327.)

In the case of *Wilson v. Calhoun*, 170 Ia. 111, 151 N. W. 1087, a deed was set aside on the ground of duress, although the evidence disclosed that the grantor, who had committed a crime, executed it only "at the urgent advice and solicitation of friends and confidants" that he do so and "flee from the country."

But appellants say that the demurrer should have been sustained because the plaintiff did not offer to place them *in statu quo*. What would have been necessary to do that they do not indicate. If they had expended any money for improvements on the farm subsequent to the deed from Ogle, or had otherwise incurred expense or suffered

damage in connection therewith, it is not disclosed by the record. All that the record shows is that they got the farm for nothing.

We find nothing in the record to justify disturbing the judgment. The judgment is affirmed.

HARVEY, SMITH and ALLEN, JJ., dissent.